Commonwealth *v.* Phelan, Appellant.

Argued April 21, 1967. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused November 24, 1967.

*Abraham J. Brem Levy*, with him *John A. Papola* and *Peter J. Liacouras*, for appellant.

*Richard A. Sprague*, First Assistant District Attorney, with him *Edwin D. Wolf*, *William H. Wolf, Jr.* and *Alan J. Davis*, Assistant District Attorneys, and *Arlen Specter*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, September 26, 1967:

The appellant, Frank Phelan, plead guilty generally to two separate indictments charging him with the murders of Judith Lopinson and Joseph Malito.[1] Subsequently, after a hearing before a three-judge court, he was unanimously found guilty of murder in the first degree and sentenced to death in each case. These appeals from the judgments followed.

The prime assignment of error is that during the proceedings Phelan was denied due process of law. This is bottomed upon the contention, that the cumulative effect of certain rulings in the court below was to deny him a fair trial and the effective assistance of counsel in defending the indictments.

It is established beyond argument that Phelan was entitled to the effective assistance of counsel at every critical stage of the case. See *Gideon v. Wainwright*, 372 U.S. 335 (1963). And this necessarily entailed the opportunity on the part of counsel to thoroughly investigate the facts and properly prepare for trial.

---

[1] Phelan also plead guilty to an indictment charging him with conspiracy to harm and injure the victims.

See *Massiah v. United States*, 377 U.S. 201 (1964), and *Powell v. Alabama*, 287 U.S. 45 (1932). Likewise, there can be no doubt but that he was entitled to a fair, complete and impartial hearing before judgment was entered against him. And this necessarily included the opportunity of presenting every fact which was material and relevant to the issues involved. However, despite the earnest arguments of able counsel, our study of the record is not convincing that Phelan was denied any of these constitutional mandates in this case. We will, therefore, affirm the judgments.

The factual background of the case is this:

During the early morning hours of June 19, 1964, Judith Lopinson and Joseph Malito were shot to death in the basement office of Dante's Restaurant, 1809 Chestnut Street, in the City of Philadelphia. At the time Dante's was operated under a partnership agreement by Jack Lopinson (husband of Judith) and Malito.

On July 15th, after an inquest conducted by the medical examiner of the City of Philadelphia, Jack Lopinson was charged with the murders and held for action by the grand jury. Later a warrant charging Phelan with the murders issued and on July 26, 1964, after a hearing before a magistrate, he was committed to the Holmesburg Prison pending action by the grand jury.

On the evening of July 27th, Phelan summoned the senior officer at the prison and told him he wanted "to confess who committed the murders." The homicide division at police headquarters was notified and on the following morning, Phelan gave the police a recorded, factual description of the killings and the circumstances which instigated them. Therein, he admitted designedly shooting the victims at the instance of Lopinson. The taking of this statement was interrupted temporarily to permit Phelan to appear in court

and testify, under oath, in a habeas corpus proceeding instituted by Lopinson. His testimony at this hearing corresponded to his statements to the police. At all times related before, Phelan was without the assistance of legal counsel.

On August 12th, John Patrick Walsh, Esq., who had been retained by the family, entered his appearance on behalf of Phelan. Mr. Walsh is a lawyer with extensive criminal trial experience and recognized by the Bench and Bar as one of Philadelphia's best in this area of the law.

On October 26th, Phelan appeared in court with Mr. Walsh and plead guilty generally to the two indictments charging him with the murders involved. During the proceedings and before the pleas were accepted, Phelan was personally questioned in open court as follows: "By the Court: (To Frank Phelan) Q. Your name is Frank Phelan? A. That's right. Q. How old are you? A. 25. Q. Incidentally, just for a little background, are you a native of Philadelphia, born here? A. I was born here. Q. Went to school in Philadelphia? A. Yes. Q. How far did you go to school? A. About nine years. Q. When you finished school, what were you in, high school? A. High School. Q. Are you married or single? A. Single. Q. You know what is going on? You understood everything that was mentioned just now? A. That's right. Q. You are before me charged with a serious offense, apparently two bills of murder and two bills of conspiracy to commit murder. You know what you are here for? A. That's right. Q. You are represented by John Patrick Walsh, Esquire, with whom you have conferred? A. That's right. The Court: Mr. Walsh, you are here and you represent him? Mr. Walsh: Yes. Mr. Sprague: Before he is arraigned, what is the plea going to be? Mr. Walsh: Guilty. Mr. Sprague: Prior to that plea, may I ask the defendant

a couple of questions? THE COURT: Yes. BY MR. SPRAGUE: (To Frank Phelan) Q. You have discussed this case with your lawyer, Mr. Walsh? THE COURT: Do you mind looking at the Court and at the District Attorney as he speaks to you? FRANK PHELAN: That's right. BY MR. SPRAGUE: (To Frank Phelan) Q. You have discussed it with your attorney? A. That's right. Q. You are entering a plea of guilty here. Is this plea voluntary on your own part? A. (No response). THE COURT: Q. Is it of your own free will? FRANK PHELAN: That's right. BY MR. SPRAGUE: (To Frank Phelan). Q. By pleading guilty you are admitting that you took part in the murder of Judy Lopinson and Mr. Malito, is that correct? A. That is correct. Q. Have any promises, deal or commitments or anything been made to you by anyone from the District Attorney's office? A. No. Q. Any promises, deals, commitments been made to by anyone representing the police department? A. No. Q. Any promises, deals, commitments been made to you by anyone representing the Court? A. No. Q. Any promises, deals, commitments, or understandings existing between you and your lawyer, Mr. Walsh in return for this plea of guilty? A. No. Q. This plea is voluntary and free on your own part? A. On my lawyer's advice. Q. It is your own plea though? A. That's right. Q. And you realize that by pleading guilty if you are found guilty of first degree murder, you can be sentenced to either death in the electric chair or life imprisonment. You understand that? A. That's right. Q. And you desire to plead guilty, is that correct? A. That's right."

By agreement the hearing to determine the degree of guilt was postponed indefinitely.

On January 29, February 1, 2, 1965, Phelan testified, under oath, as a Commonwealth witness in the trial of *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A. 2d 552. Again his testimony dovetailed with his previous statements of guilt.

On July 19, 1965, Phelan filed with the court a self-handwritten petition asking that Mr. Walsh be dismissed as counsel and other counsel be appointed on his behalf. Mr. Walsh filed a contemporaneous petition asking permission to withdraw from the case on the ground that he and his client had become estranged. On July 27th, after hearing, the court permitted Mr. Walsh to withdraw as counsel and on August 2nd entered an order appointing Mr. Levy and Mr. Papola, present counsel, to represent Phelan.

The rulings of the court below which, it is urged denied Phelan the effective assistance of counsel and a fair trial, were all entered subsequent to August 2nd. We will now discuss each one in detail.

Following their appointment, Phelan's counsel sought the court's permission on two occasions to withdraw his pleas of guilty and enter not guilty pleas on his behalf. The requests were denied.

The first such motion was filed on October 8, 1965, nearly one year after the pleas had been entered and accepted by the court,[2] and exactly three days before October 11th, the time previously fixed for hearing to determine the degree of guilt. The second such motion was filed on October 11th.

In these motions Phelan asserted he should be permitted to withdraw the pleas of guilt, because, (1) he had not been "arraigned" on the indictments in open court; (2) at the time he entered the guilty pleas his mental and physical condition were such that he was unable to comprehend the nature and effect of the proceedings; and, (3) of the existence of "after discovered evidence".

---

[2] However, on July 27, 1965, during the hearing before the court on Phelan's request for new counsel, he did state to the court: "If the lawyer that put that guilty plea in has withdrawn, that should also be withdrawn. . . . I'm not claiming my plea was one by me."

The court held a hearing on these motions on October 11, 1965, and afforded Phelan the opportunity of presenting any available evidence he desired in support thereof. Not an iota of evidence was submitted.[3]

The right to arraignment in open court is statutory (although it does have constitutional overtones). It consists in a reading of the indictment to the accused and calling upon him to plead thereto.[4]

The record of the plea proceedings in the instant case contains the following: "Defendant, arraigned at bar of the court, pleads guilty to Bill No. 468, Murder, and to Bill No. 469, Murder."

It is argued that since the record does not specifically show that the contents of the indictments were read to Phelan at the time, he was not validly arraigned, and the subsequent pleas were of no effect. This is devoid of merit.

First, it is the distinct recollection of the trial judge, as noted in the record, that the indictments were read to Phelan at the pertinent time. We accept this statement. Secondly, the purpose and necessity of an arraignment is to fix the identity of the accused, to inform him of the nature of the charges against him and to give him the opportunity of informing the court of his plea thereto. See 21 Am. Jur. 2d, Criminal Law §452 (1965), and cases cited therein. See also, 4 Wharton on Criminal Law and Procedure §1802 (1957). Due process of law does not require that any technical form of procedure be followed so long as the identity of the accused is definite, sufficient notice of

[3] Phelan's counsel insisted they were unprepared to meet the issue, because previous orders of the court denied them the opportunity of properly investigating. This will be discussed infra.

[4] See Rule 317(a) Pa. R. Crim. P. (effective January 1, 1965) which states what an "arraignment" shall consist of. The definition therein is in accord with the long established understanding of the term. See 21 Am. Jur. 2d, Criminal Law §452 (1965).

the charges is given, and ample opportunity to plead afforded. See *Garland v. State of Washington*, 232 U.S. 642 (1914), and *Yodock v. United States*, 97 F. Supp. 307 (1951). The identity of the accused herein is unquestioned and, upon a reading of the record of the plea proceedings, one would have to completely distort his thinking to believe that Phelan was not fully aware of the nature of the charges lodged against him, or that he was denied ample opportunity of expressing his plea thereto. Hence, even in the absence of a reading of the contents of the indictments, all of the basic requirements of an arraignment were fully complied with in this case.

The burden of proving that Phelan did not understand the nature and effect of his guilty pleas, or there existed after discovered evidence which would warrant the withdrawal thereof was upon him. See *Commonwealth ex rel. Foeman v. Maroney*, 420 Pa. 486, 218 A. 2d 230 (1966), and *Commonwealth ex rel. Hilberry v. Maroney*, 424 Pa. 493, 227 A. 2d 159 (1967). This burden was not met. As noted before, there was no attempt to meet it, although ample opportunity was afforded.

As to the existence of after discovered evidence, it is significant that what this constituted was not set forth in the relevant motion, nor was the court below ever informed of the nature thereof. We cannot help but conclude that nothing of this character existed, and the allegation was based solely on the hope of counsel that such might somehow develop.

In the total absence of evidence to support the allegation of the existence of "after discovered evidence" or lack of competency on the part of Phelan at the time of plea, the court very properly denied the requests to withdraw the guilty pleas. But this is not all to be considered in assessing the correctness of the court's ruling. These additional facts must be remembered:

(1) That during the plea proceedings, in response to questions by the court and Commonwealth's counsel, Phelan clearly manifested a thorough understanding of the nature of the charges, the possible punishment after conviction and the fact he was admitting his guilt in open court; (2) That the pleas were entered in the presence of very competent counsel who never once during the period of several months he represented Phelan ever challenged the validity of the pleas, or even suggested his client lacked an awareness of the nature and effect thereof; (3) That the allegation Phelan lacked competency to understand at the time of plea was made for the first time nearly one year after the pleas were entered; (4) That Phelan's first admission of guilt was in the form of a truly spontaneous and volunteered statement to the police; (5) That on two occasions, other than the plea proceedings involved, Phelan appeared in court where, under oath, he publicly, unequivocally and voluntarily stated he committed the killings.

To permit the withdrawal of the pleas involved on this posture of the record would have constituted a travesty of justice.

The right to withdraw a guilty plea by a criminal defendant is not absolute. As stated in *Commonwealth v. Scoleri,* 415 Pa. 218, 247-248, 202 A. 2d 521, 536 (1964): "The withdrawal of a plea of guilty is properly allowed (a) where it has been entered in ignorance of the nature of the crime with which defendant has been charged and the consequences of his plea, or (b) where the plea of guilty was not made freely and voluntarily, or (c) where the plea was entered by mistake, or without the consent of the defendant, or (d) where the plea was entered by an uncounseled defendant in a homicide case, or in a felony case in which defendant was indigent or was refused counsel. . . ., or (e) where the plea was induced by fraud

or threats or justifiable fear, or (f) where a trial or hearing Judge has made, but has not kept, a promise or commitment which induced the plea, or (g) where because of very unusual circumstances, the Court believes that Justice will best be served by submitting the case to a jury." (Original emphasis omitted.) See also, *Everett v. United States,* 336 F. 2d 979 (D.C. Cir. 1964), and *Williams v. United States,* 192 F. 2d 39 (5th Cir. 1951).

The present record contains nothing that would place the case in any of the categories delineated in *Scoleri,* supra.

Following their appointment, Phelan's present counsel requested leave of court to hire a special investigator and psychiatric experts to examine their client. These motions were denied.[5] It is urged that these rulings denied counsel the necessary tools with which to effectively represent their client.

As stated before herein, Phelan's counsel were clearly entitled to investigate and ascertain all facts incident to the case and to properly prepare to meet all issues that might arise during hearings in connection therewith. And since Phelan was indigent, the trial court was empowered to authorize at county expense, the utilization of the services of experts, such as those requested, to assist in the preparation and presentation of his cause. See Act of March 22, 1907, P. L. 31, as amended, 19 P.S. §784. And while, at first blush, it might appear that the court's denial of permission to hire the experts requested constituted an abuse of discretion and, more importantly, a deprivation of the constitutional right to the effective assistance of coun-

---

[5] On October 13th, following the conclusion of the hearing held to determine the degree of guilt, the court did authorize the hiring of an investigator. This, of course, was too late to help counsel in the preparation for any hearings concerned herein.

sel, a careful consideration of all the pertinent facts compels a contrary conclusion.

As noted before, present counsel were appointed on August 2, 1965. The hearing to determine the degree of guilt was conducted on October 13th. The hearing to fix the punishment proceeded on October 15th.

Through the services of the investigator requested, it appears from the briefs filed in this Court that counsel wished to investigate rumors that Phelan's admissions of guilt, his testimony in the related case involving Lopinson, and his own pleas of guilty in court were the result of improper police practices following his arrest, including the administering of drugs. In all of the varied motions filed below, it is noteworthy there is a total absence of any assertion that Phelan's pleas of guilty were coerced, unlawfully induced, or in any sense involuntarily entered. Additionally, during his testimony in the Lopinson trial, Phelan was vigorously cross-examined as to his treatment by the police during his confinement and his use of drugs. He categorically denied that his admissions of guilt or testimony against Lopinson were induced by any conduct on the part of the police or by the use of drugs. Also, at the hearing on the motions to withdraw the pleas, Phelan did not testify or change his story in this respect.

Furthermore, following their appointment, Phelan's counsel were given full access to (1) the record of the Lopinson trial which included Phelan's own testimony concerning the facts which were to be the subject of the further investigation, and a detailed record of all drugs and medications administered to Phelan during the period of confinement, from the date of arrest to the Lopinson trial; (2) copies of all statements Phelan made to the police during his confinement; and, (3) the complete record kept at Holmesburg Prison concerning Phelan's confinement, including the reports

of several medical examinations and the time and date any drugs or medication were made available to him.

In view of all the facts enumerated above, and the limited purpose for which the services of the proposed investigator was sought, we are not persuaded that counsels' effectiveness was in any sense curtailed by the challenged order of the court below.

The request for permission of the court to retain psychiatrists to examine Phelan on behalf of the defense was first made on October 11, 1965. The purpose given was to ascertain the competency of Phelan to understand his pleas of guilty entered as of October 26, 1964. In fact, in answer to questions of the court, defense counsel specifically stated it was not for the purpose of deciding if Phelan could then stand trial.

When this motion was made, Phelan's counsel were already in possession of a report, dated October 24, 1964, from Dr. Robert Leopold, and another, dated December 24, 1964, from Dr. Kenneth Appel, both eminent psychiatrists, given as a result of examinations made at the request of Mr. Walsh, Phelan's previous counsel. Both reports stated the opinion, inter alia, that Phelan was suffering from a chronic, progressive schizophrenia and a compulsion to kill. However, it was also opined therein that he could distinguish between right and wrong, and nothing therein indicated he lacked the understanding to know the nature or quality of his acts. Also available to defense counsel, as of this date, were the reports of psychiatrists and other physicians who had examined Phelan at the request of the prison officials or the prosecuting authorities.

Two days later on October 13th, counsel renewed the motion for permission to retain the services of psychiatrists to examine Phelan. However, this time the purpose advanced was to inquire into his ability to

stand trial. The motion was refused. However, the court simultaneously stated that if after hearing the testimony available in the case, it was deemed necessary that further psychiatric examinations be pursued, it would order such to take place. At trial the court was given the benefit of extensive testimony resulting from psychiatric examinations of Phelan. While Phelan did not testify personally, the court also had the opportunity of observing him throughout the proceedings, and noted of record his apparent knowledgeable attention and active cooperation with his counsel. As a further indication of Phelan's ability to stand trial, he signed the motion asking permission to withdraw the guilty pleas in open court on October 11th, and in response to questions readily answered that he read the motion and understood it.

In view of all these facts, we are not convinced that the court abused its discretion or unduly proscribed counsels' effectiveness in refusing to order additional psychiatric tests. Citing *Pate v. Robinson,* 383 U.S. 375 (1966), it is argued that if a "bona fide doubt" existed as to Phelan's competence to stand trial, it was mandatory upon the court to order an independent determination of his sanity. The ruling in *Robinson* was based upon the requirements of a specific statute of the State of Illinois: *Pate v. Robinson,* supra, at 385. More importantly, the evidence in this record warrants no such doubt.

During the hearing to determine the degree of guilt, the court refused to admit medical testimony tending to establish that at the time of the commission of the crimes Phelan lacked the mental ability to form the intent to kill, a necessary ingredient of first degree murder, and lacked substantial capacity to conform his conduct to the requirements of the law. This was not error. See *Commonwealth v. Ahearn,* 421 Pa. 311, 218 A. 2d 561 (1966), and *Commonwealth v. Wood-*

*house,* 401 Pa. 242, 164 A. 2d 98 (1960). As stated in *Commonwealth v. Ahearn,* supra, at 324, 218 A. 2d at 568, such evidence is not admissible "(1) to absolve or exculpate and acquit a defendant of crime, or (2) to prove a lack of specific intent to kill, and thereby prohibit a verdict of murder of the first degree." See also, *Commonwealth v. Carroll,* 412 Pa. 525, 194 A. 2d 911 (1963). Moreover, this testimony was properly received in evidence and considered by the court in mitigation of the penalty during the hearing to determine the sentences to be imposed.

Finally, we find no abuse of discretion or denial of due process of law in the court's ruling of October 11, 1965, refusing a continuance of the hearings.

Judgments affirmed.

Mr. Justice COHEN dissents.

---

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I join in the excellent Opinion of the Court written by Justice EAGEN. The lower Court correctly admitted in evidence and the majority Opinion correctly holds that the testimony of defendant's psychiatrists, who admitted defendant knew the difference between right and wrong, was not admissible for the purpose of determining innocence or guilt, but was admissible in considering the sentence or penalty: *Commonwealth v. Ahearn,* 421 Pa. 311, 218 A. 2d 561.

For many years, psychiatrists have attempted to change the law involving murder and are constantly adopting different psychiatric ideas and terminology to express and justify their beliefs that a criminal is a sick person but not a criminal. As this Court said in *Commonwealth v. Ahearn,* 421 Pa., supra (pp. 320, 321, quoting from *Commonwealth v. Tyrrell,* 405 Pa. 210, pp. 219, 221) : " 'The doctrine of "irresistible impulse" or in the modern psychiatric vernacular "inability to control one's self", whether used to denote legal

insanity, *or as a device to escape criminal responsibility for one's acts or to reduce the crime or its degree, has always been rejected in Pennsylvania* . . . "Certainly neither social maladjustment, *nor lack of self-control*, nor impulsiveness, nor psycho-neurosis, *nor emotional instability*, nor chronic malaria, nor all of such conditions combined, constitute insanity within the criminal-law conception of that term." [Emphasis in original]' "

As Chief Justice HORACE STERN so pertinently said in *Commonwealth v. Neill*, 362 Pa. 507, 67 A. 2d 276, where the Court rejected the defense that confusional insanity amounted to legal insanity (pp. 513-514, 514-515) : "Apart from the fact that 'confusional insanity' is apparently an antiquated and discarded theory and that the proposition that there could be such a thing as a momentary insanity was sharply challenged by an expert witness for the Commonwealth, it would seem quite obvious that defendant's witness failed to differentiate between a mere temporary frenzy or emotional excitation, and insanity within the legal meaning of that term, namely, inability, from disease of the mind, to understand the nature and quality of the act and to distinguish between right and wrong with respect to it: Commonwealth v. Szachewicz, 303 Pa. 410, 416, 417, 154 A. 483, 484, 485; Commonwealth v. Lockard, 325 Pa. 56, 60, 188 A. 755, 757.

". . . Certainly neither social maladjustment, nor lack of self-control, nor impulsiveness, nor psychoneurosis, nor emotional instability, nor chronic malaria, nor all of such conditions combined, constitute insanity within the criminal-law conception of that term."

The dissenting Opinion proves too much, so much in fact that it disproves its own theory. It completely overlooks or completely ignores the testimony of defendant's psychiatrists, who admit defendant knew the difference between right and wrong and the legal con-

sequences of his criminal actions. They testified that "He told us that his feelings of needing to kill had been present for as long as he could remember. He regrets that he was not in the Marine Corps during the war because he said that he would have felt better if he could have killed twelve or fifteen people. . . . He is a thoroughly dangerous human being who . . . can be expected to kill at any time that he is under . . . sufficient emotional pressure . . . and his sickness of mind is so strong that he is not free to act . . . before the strength of his destructive almost animalistic drive and almost delight in killing." How can the dissenting Opinion ignore this testimony! How can the dissenting Opinion argue that defendant did not have the ingredient and hallmark of a nonfelony first degree murder, viz., a specific intent to kill, just because his intent to kill was uncontrollable!

I express, with great restraint, my conviction that the psychiatric test advocated in the dissenting Opinion (1) would turn over to psychiatrists, instead of to Courts and juries, the determination of criminal responsibility and murder, and (2) would whitewash and release nearly every murderer, and (3) would make the safety and protection of law-abiding citizens from the (admittedly) most dangerous killers—i.e., those whom the psychiatrists say have an uncontrollable urge to kill—a travesty.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I can only reiterate what I said in *Commonwealth v. Ahearn*, 421 Pa. 311, 331, 218 A. 2d 561, 571 (1966): "It is a commonplace that hard cases make bad law, yet it is one that we need remember. There can be no doubt that this Court is now faced with a hard case. Unfortunately, in my opinion, the result reached represents bad law. Despite the brutality of the crime, despite the overwhelming evidence of the existence of the

elements of murder in the first degree, despite my own
evaluation of the psychiatric testimony here in dispute,
I must dissent. In my view, the majority unwisely re-
stricts the purpose for which psychiatric evidence may
be admitted, and thereby binds the courts of this Com-
monwealth to a rule which is contrary to enlightened
authority."

In an attempt to demonstrate that appellant lacked
the specific intent to kill which is a necessary in-
gredient of a first degree nonfelony murder conviction,
counsel offered several reports by eminent psychia-
trists. Consistent with the *Ahearn* decision, the court
below acting as the fact-finder refused to admit this
medical testimony on the specific intent issue although
it did accept this evidence in mitigation of penalty.

The report of Dr. Robert L. Leopold contained the
following characterization of appellant: "From the
psychiatric standpoint, there is no question whatsoever
in our [Dr. Leopold and Dr. M. Lawrence Spoont]
minds that this man is suffering from severe, chronic,
progressive schizophrenia. He is impulse-ridden, de-
lusional, hallucinatory, and without insight. We desire
to stress that he is a thoroughly dangerous human be-
ing who has no control whatsoever over his own ag-
gression and who, because of his paranois [sic], can be
expected to kill at any time that he is under what for
him is sufficient emotional pressure. . . .

"We are aware that the McNaughton [sic] formu-
lation of criminal insanity includes only the concept of
whether a man knows the difference between right
and wrong. On an intellectual level, Frank Phelan
can make this distinction. It is, however, meaningless
to him because such an intellectual concept is over-
whelmed totally by his psychotic needs."

Dr. Kenneth E. Appel, Emeritus Professor of Psy-
chiatry at the University of Pennsylvania, concluded:
"He can say the words right and wrong, he can tell

the legal consequences of criminal actions, such as murder, but his pathology or sickness of mind is so strong that he is not free to act under such concepts and considerations—they are irrelevant, purely verbal and impotent before the strength of his destructive almost animalistic drive and almost delight in killing.

"The diagnosis is mental disease—Severe Intense Paranoid *Schizophrenia,* in my opinion—with delusions of grandeur, persecution and compulsion to kill." (Emphasis in original.)

Hornbook law tells us that relevant evidence is admissible evidence. Professor McCormick has succinctly stated: "[T]he most acceptable test of relevancy is the question, does the evidence offered render the desired inference *more probable than it would be without the evidence?* . . . Relevant evidence, then, is evidence that in some degree advances the inquiry, and thus has probative value, and is prima facie admissible." McCormick, Evidence §152, at 318-19 (1954). (Emphasis in original.) Certainly, the two psychiatric reports quoted above advance the inquiry as to whether Phelan had the requisite specific intent and make it more probable that he did not than it would be without the evidence. The M'Naghten rule, which formed the basis for exclusion of similar evidence in *Ahearn,* is nowise an evidentiary test; devised to establish a standard of the degree of mental impairment necessary to render a defendant not criminally responsible, it should not be employed to restrict the scope of relevant evidence on an entirely distinct issue, *i.e.,* specific intent to kill.

The *Ahearn* decision was, in fact, a departure from prior Pennsylvania law—a departure I could not sanction then and cannot now. In several of the cases cited by the *Ahearn* majority on the admissibility issue, the lower court *did* permit the psychiatrist to give his expert opinion as to the defendant's state of mind.

284

See *Commonwealth v. Carroll,* 412 Pa. 525, 194 A. 2d 911 (1963); *Commonwealth v. Jordan,* 407 Pa. 575, 181 A. 2d 310 (1962); *Commonwealth v. Tyrrell,* 405 Pa. 210, 174 A. 2d 852 (1961); *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A. 2d 98 (1960); *Commonwealth v. Neill,* 362 Pa. 507, 67 A. 2d 276 (1949). In each of these cases we merely questioned the weight to' be accorded such evidence and did not rule that the evidence was inadmissible.

The vice of the majority's position is self-evident. It has been rejected in other M'Naghten jurisdictions[1] and by The American Law Institute.[2] So long as a specified mental state forms one of the elements of first degree nonfelony murder, this Court should not deprive the fact-finder of relevant, possibly probative, evidence. To ignore the contribution psychiatry can make to the reliability of verdicts is to retreat from the Twentieth Century.

I am compelled to dissent.

---

[1] *People v. Henderson,* 60 Cal. 2d 482, 386 P. 2d 677, 35 Cal. Rptr. 77 (1963) (TRAYNOR, C. J.); *Battalino v. People,* 118 Colo. 587, 199 P. 2d 897 (1948); *State v. Gramenz,* 256 Iowa 134, 126 N.W. 2d 285 (1964); *State v. DiPaolo,* 34 N.J. 279, 168 A. 2d 401 (1961) (WEINTRAUB, C. J.). Rejection of the majority's restrictive view. is not of totally recent origin. See *Andersen v. State,* 43 Conn. 514 (1876); *People v. Moran,* 249 N.Y. 179, 163 N.E. 553 (1928); *State v. Green,* 78 Utah 580, 6 P. 2d 177 (1931); *Dejarnette v. Commonwealth,* 75 Va. 867, 884 (1881) (dictum).

[2] A.L.I. Model Penal Code, §4.02(1) (Official Draft, 1962).