Commonwealth *v.* Weinstein, Appellant.

Argued January 13, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused March 17, 1971.

*Raymond J. Bradley,* with him *Louis Lipschitz,* for appellant.

*James D. Crawford,* Deputy District Attorney, with him *Carl B. Feldbaum,* Assistant District Attorney,

*Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

Opinion Per Curiam, January 26, 1971:

The Court being equally divided, the judgment of sentence is affirmed.

Mr. Justice Cohen took no part in the decision of this case.

———

Opinion in Support of the Affirmance of the Judgment of Sentence by Mr. Chief Justice Bell:

Appellant Stephen Weinstein, while represented by counsel, pleaded guilty to an indictment charging him with murder. A three-Judge Court, after rejecting defendant's offer of psychiatric testimony as to the degree of his guilt, found him guilty of murder in the first degree and sentenced him to life imprisonment. The present appeal was taken from this Judgment of Sentence.

The appellant makes numerous contentions in this appeal, but, most importantly, he asks the Court to *specifically overrule the recent decisions* of this Court and the long-established and recently reaffirmed law of Pennsylvania. Moreover, realistically, and no matter how camouflaged, he asks the Court to turn over, *in large measure,* the determination of guilt of murder in the first degree to psychiatrists. Appellant advocates that the Court adopt, as a basic test of first-degree murder, the opinions of psychiatrists which, as is well-known, almost always are based upon the self-serving and unsworn statements of the defendant and his family, which statements are almost invariably not subject to proof or even to cross-examination. If adopted, this would be one of the most regrettable decisions ever made in the history of Pennsylvania. Although

substantial advances have been made in the field of psychiatry, it is still (as nearly everyone knows) an inexact science and the most unstable, vacillating, fluctuating, indefinable and constantly changing "guesswork" ever yet invented. Furthermore, the adoption of appellant's contentions would make a mockery of "Stare Decisis," the Rock of Gibraltar of the Law.* And to pile Pelion upon Ossa, it is likewise obvious that the adoption of appellant's contentions would foreshadow the elimination of the famous and countless times affirmed M'Naghten Rule and the substitution of some new, indefinite and indefinable psychiatric test.

For these reasons, I deem it important to set forth at some length both the facts and the pertinent and controlling principles of law which have been long established and recently reaffirmed by this Court.

Appellant, Stephen Z. Weinstein, *while represented by two attorneys, entered a plea of guilty* to an indictment charging him with murder. The case was heard beginning on May 13, 1968, by a three-Judge Court. That Court, *after rejecting appellant's offer of psychiatric testimony as to the degree of guilt,* found him guilty of murder in the first degree. The Court, on May 16, 1968, sentenced appellant to life imprisonment. From this Judgment of Sentence, Weinstein appeals.

The most important question in this appeal is whether we should overrule three of the very recent decisions of this Court, as well as our long-established law, and hold that psychiatric evidence is admissible to prove that the defendant lacked the mental ability to form an intent to kill, which is a necessary ingredient of first-degree (nonfelony) murder.

I shall first discuss the sordid details of this murder and the important facts which are set forth in defendant-appellant's confession.

---

* Stare Decisis will be hereinafter discussed.

At the time of the murder, appellant was the proprietor and operator of a tobacco shop at a pier along the Delaware River in what was known as the "Philadelphia 1700 Complex." He was also the joint owner of a tobacco shop at 3643 Walnut Street in Philadelphia, near the campus of the University of Pennsylvania.

Appellant first met his victim, Green, on October 16, 1967, when Green came into his Walnut Street store to purchase a pipe. Attracted to Green by his tight-fitting levis, appellant engaged Green in a conversation about boats, in which they had a mutual interest. Appellant then invited Green to visit his tobacco shop in the Philadelphia 1700 Complex, where he could see the boats on the Delaware River. Green accepted and a meeting was arranged for the following Sunday, October 22.

Before the Sunday meeting, appellant emptied into a small jar the contents of some ten sleeping capsules, intending to use them on Green. When Green came to appellant's Walnut Street shop on Sunday, appellant offered to get him a hamburger, and the unsuspecting Green accepted appellant's hospitality. Appellant sprinkled the powder on the hamburger and gave it to Green. Appellant and Green then took a taxicab to appellant's Philadelphia 1700 Complex shop. By the time they reached the shop, Green complained of drowsiness, and within an hour he fell to the floor unconscious.

Shortly thereafter, appellant and a young friend, James Hammell, to whom appellant had previously telephoned, attempted to revive Green, but to no avail. *According to appellant's confession,* after Hammell left his shop, *he was suddenly filled with a strange sexual urge.** Appellant then strangled Green, first*

---

* Defendant's alleged sexual desires and urgings from his youth onward (assuming their truth) obviously show not an inability to

*with a piece of rope and then with his bare hands,* and this killed him. Shortly afterward, appellant, with the assistance of Hammell and some other boys, attempted to dispose of Green's body. Unable to bury the body in a wooded area near Reading, Pennsylvania, appellant and Hammell eventually placed the body in a trunk, filled it with stones, and dumped it into the Delaware River near the Philadelphia 1700 Complex. Appellant subsequently fled to New York City, where he was eventually apprehended by the New York police. After his apprehension and after having been warned of all his Constitutional rights, he gave a confession to Richard A. Sprague, Assistant District Attorney of Philadelphia, which disclosed the hereinabove recited facts, and this confession was introduced at his murder hearing without objection.

This confession formed the basis for the prosecution's case at the *degree-of-guilt* hearing. The prosecution also introduced (1) statements by James Hammell corroborating some parts of appellant's confession, and (2) the testimony of Dr. Robert L. Catherman, Assistant Medical Examiner of Philadelphia, who testified as to the cause of death.

Sprague further testified that *appellant told him the following* additional history of his life: He (Weinstein) had shown signs of abnormal sexual attitudes from his early teens. He had (so he said) a habit of tearing up Boy Scout uniforms, from which he derived some sexual satisfaction. As he grew older this fetish increased to the point where he derived sexual pleasure (a) from watching young men who wore tight-fitting levis, or trousers, and (b) from destroying these garments. Later, he came into contact with several teenage boys in the neighborhood of his Walnut Street

---

form an intent to kill, as appellant erroneously contends, but an irresistible impulse.

store. He induced these boys to steal levis for him to destroy, and occasionally to participate in sexual conduct with him.

Male undergraduates from the University of Pennsylvania frequented appellant's store on Walnut Street. Stimulated by the sight of these young men in tight-fitting levis, appellant on several occasions gave them drugs while they were in his tobacco shop, thereby enabling him (so he said) to take their levis from them and tear them up for his perverted pleasure.

Dr. Matthew T. Moore, Professor of Neuropathology at the University of Pennsylvania Medical School, who was called by the appellant, had examined the appellant on three separate occasions *after* his arrest, *and had also interviewed appellant's parents.* Based on these interviews, appellant's attorneys offered to prove by Dr. Moore that at the time of the commission of the murder, appellant (instead of being moved by an irresistible sexual impulse) *lacked the mental ability required to form a specific intent to kill*—which is an essential ingredient of nonfelony first-degree murder cases—*and that he would have been unable to carry out a killing by premeditation.* This proffered testimony was offered at defendant's *guilt hearing* after his plea of guilty to murder, to rebut the Commonwealth's evidence that defendant had committed murder *in the first degree,* i.e., a willful, deliberate and premeditated killing which, I repeat, requires a specific intent to kill. This specific intent can, of course, be found by the jury or the Judge who tries the case from all the pertinent facts and all the attendant circumstances, together with all reasonable inferences therefrom. *Commonwealth v. Winebrenner,* 439 Pa. 73, 265 A. 2d 108; *Commonwealth v. Ewing,* 439 Pa. 88, 264 A. 2d 661; *Commonwealth v. Commander,* 436 Pa. 532, 260 A. 2d 773.

The Commonwealth's objection to the introduction of this evidence at the trial hearing *on the issue of murder and the degree thereof* was sustained.

We note at this point that *Dr. Moore's testimony was thereafter properly admitted by the Court at the sentencing hearing* to aid the Court in its determination of an appropriate sentence. It is well and long established that, in determining and imposing a sentence, a Court (after a guilty plea, or after a jury's verdict of guilty) must consider (1) the criminal act as well as all the attendant and surrounding circumstances of the crime, and (2) also all the evidence, culpatory and exculpatory, incriminating and extenuating, concerning the defendant himself, his alleged thoughts, his actions, his reactions and his prior life. To epitomize: the sentence or penalty is determined and imposed from a consideration of the crime and the criminal. See *Commonwealth v. Melton,* 406 Pa. 343, 178 A. 2d 728; *Commonwealth v. Phelan,* 427 Pa. 265, 234 A. 2d 540, and cases cited therein.

## The Present Law

Appellant did not offer this psychiatric evidence to prove insanity, *nor does he specifically ask us to extirpate* the M'Naghten Rule, which has been long and firmly established in Pennsylvania.* Instead, he asks us to *specifically* overrule *Commonwealth v. Phelan,*

---

* Neither Judges nor psychiatrists, doctors, lawyers, textwriters or professors have been able to formulate or agree upon a better or wiser or more realistic rule or principle of law for the test or determination of insanity than the M'Naghten Rule. No matter how disguised or camouflaged, this is merely the first step in repetitious attempts to abolish and exterminate the M'Naghten Rule and substitute an unknown, vacillating and uncertain psychiatric rule which neither the Courts nor the psychiatrists have been able to fashion or formulate.

427 Pa., supra, and *Commonwealth v. Ahearn*, 421 Pa. 311, 218 A. 2d 561, and *Commonwealth v. Rightnour*, 435 Pa. 104, 253 A. 2d 644, and to hold that psychiatric evidence is admissible to establish that a defendant could not form a specific intent to kill. In several recent cases, this Court *specifically and expressly* rejected appellant's contentions that psychiatric testimony is or should be admissible in murder trials *on the issue of the degree of guilt* and the requisite essential for first-degree murder *of a specific* intent to kill. This law is not only wise but is absolutely necessary for the protection and safety of the law-abiding public, and there is absolutely no reason or justification for overruling or changing it. A review of our recent decisions in murder cases will answer and refute all of appellant's superficial and illogical reasons for his unjustifiable and unrealistic psychiatric contentions.

In *Commonwealth v. Phelan*, 427 Pa., supra (1967), after the defendant, while represented by able counsel, had pleaded guilty to murder, the Court in an Opinion by Justice EAGEN, joined in by Chief Justice BELL,\* Justice MUSMANNO, Justice JONES and Justice O'BRIEN, pertinently and controllingly said (pages 278-279): *"During the hearing to determine the degree of guilt*\*\* the court refused to admit medical testimony tending to establish that at the time of the commission of the crimes *Phelan lacked the mental ability to form the intent to kill,* a necessary ingredient of first degree murder, and lacked substantial capacity to conform his conduct to the requirements of the law. This was not error. See Commonwealth v. Ahearn, 421 Pa. 311, 218 A. 2d 561 (1966), and Commonwealth v. Woodhouse, 401 Pa. 242, 164 A. 2d 98 (1960). As stated in Com-

---

\* Mr. Chief Justice BELL *joined* in the Majority Opinion and also filed a concurring Opinion.

\*\* Italics throughout, ours, unless otherwise noted.

monwealth v. Ahearn, supra, at 324, 218 A. 2d at 568, *such evidence is not admissible '(1) to absolve or exculpate and acquit a defendant of crime, or (2) to prove a lack of specific intent to kill, and thereby prohibit a verdict of murder of the first degree.'* See also, Commonwealth v. Carroll, 412 Pa. 525, 194 A. 2d 911 (1963). Moreover, this testimony was properly received in evidence and considered by the court in mitigation of the penalty during the hearing to determine the sentences to be imposed."

In *Commonwealth v. Ahearn,* 421 Pa., supra, the defendant, while represented by three lawyers, pleaded guilty to an indictment charging him with murder. The Judge found him guilty of murder in the first degree and sentenced him to life imprisonment. This Court, affirming the judgment of sentence, said (pages 314-315, 319-320, 320-321, 324-325) :

"We note at the outset that defendant did not take the witness stand; instead he relied upon the testimony of two psychiatrists and one psychologist who, in the last analysis, based their opinions to a large extent *upon defendant's self-serving, unsworn, uncorroborated statements to them about his prior life and his actions and reactions, some of which are fantastic.* Neither defendant nor his counsel nor his witnesses contend that he was insane under the M'Naghten Rule. Instead, he contends (1) that there was no motive for his crime, and (2) that because of his mental condition, which was induced by feeling the breasts of his victim, or by the tremendous pleasure he got from hearing women scream in agony when he beat them up,** he could not form an intent to kill. In other words, defendant contends that because of his mental condition, his excitement, and his reactions when wom-

---

* Italics in *Commonwealth v. Ahearn.*
** Footnote omitted.

en were involved, *it was impossible for him to form a specific intent to take a human life,** and consequently he could not be convicted of any crime higher than murder in the second degree. . . .

"Neither defendant's psychiatrists nor any of his witnesses, we repeat, testified that defendant was insane under the M'Naghten Rule. The testimony of defendant's experts, if believed, would establish an irresistible impulse to violence in certain sexual situations. Psychiatric names or definitions vary or change almost as rapidly as 'bridge conventions'; and the use of terms such as 'irresistible impulse,' or 'diminished responsibility', or 'inability to control oneself', or 'temporary partial insanity', or *various kinds of psycopaths,** are not sufficient to change what the psychiatrists used to call and what, in legal language, has always been called, an irresistible impulse.

. . .

"In Commonwealth v. Melton, 406 Pa. 343, 178 A. 2d 728, the Court [with one concurrence] aptly said (pages 349-350):

" 'There is not the remotest merit to defendant's contention that because of his deficient mentality, the Court did not have the power to convict him of murder in the first degree.

" 'In Commonwealth v. Smith, 405 Pa. 456, we sustained a verdict of guilty of murder in the first degree with penalty of death, even though defendant was a *sexual psychopath.* We there said [with one concurrence and no dissents] (pages 459-460): "This Court has sustained a verdict of *first degree* murder with penalty of death where defendant allegedly had an *irresistible impulse,** was a moron or a mental defective *or a sexual pervert* or a *psychopathic personality,** or had been previously confined in the hospital for the

---

* Italics in *Commonwealth v. Ahearn.*

criminal insane for 14 years, or was a schizophrenic psychopath or was an unstable, mentally defective moron, or was feeble-minded: Commonwealth v. Leamer, 386 Pa. 485, 126 A. 2d 409; Commonwealth v. Cole, 384 Pa. 40, 119 A. 2d 253; Commonwealth v. Gossard, 383 Pa. 239, 117 A. 2d 902; Commonwealth v. Elliott, 371 Pa. 70, 89 A. 2d 782; Commonwealth v. Carluccetti, 369 Pa. 190, 85 A. 2d 391; Commonwealth v. Givens, 363 Pa. 141, 69 A. 2d 142; Commonwealth v. Neill, 362 Pa. 507, 67 A. 2d 376; Commonwealth v. Howell, 338 Pa. 577, 13 A. 2d 521; Commonwealth v. Hawk, 328 Pa. 417, 196 A. 5; Commonwealth v. Stabinsky, 313 Pa. 231, 169 A. 439." '

"Defendant in the instant case makes the same contentions as were made in the aforesaid cases, but instead of calling himself a mental defective or a sexual pervert, or some kind of a psycopath, or that he had an irresistible impulse, he contends that his is a case of 'diminished responsibility.' By whatever name psychiatrists, or doctors or lawyers call it, *an inability to control one's self under certain circumstances is legally insufficient to justify* an acquittal of murder, or *a reduction of a first degree murder killing to second degree.*

. . .

"In Commonwealth v. Tyrrell, 405 Pa., supra, the Court [*in a unanimous Opinion*] sustained a verdict of first degree murder with penalty of life imprisonment and pertinently said (pages 219-221): 'As a result Dr. Coleman determined that the defendant was *psychotic since teen age* and that he was so emotionally upset on March 7, 1960, that "he would react to an impulse to pick up a loaded shotgun resting at his elbow and fire it at his wife, *and that at that time he had no intent to take his wife's life.*"

" 'The doctrine of "irresistible impulse" or in the modern psychiatric vernacular "inability to control

one's self", whether used to denote legal insanity, *or as a device to escape criminal responsibility for one's acts or to reduce the crime or its degree, has always been rejected in Pennsylvania*\* . . . .

" 'In Commonwealth v. Woodhouse, 401 Pa. 242, 164 A. 2d 98, defendant shot and killed his adopted daughter; this Court affirmed his conviction of murder in the first degree [with penalty of life imprisonment]. Three psychiatrists testified that *defendant,*\* at the time of the commission of the killing, *was suffering*\* from a paranoid psychosis, or from a delusion, or *from a severe psychosis*\* accompanied by *serious delusions,*\* or was a paranoid schizophrenic and at times did not know the difference between right and wrong *and acted under an irresistible impulse*\* and hence was insane. This Court, in a learned opinion by Mr. Justice EAGEN, analyzed at length and firmly rejected, as this Court had often previously done, the theory of irresistible impulse as a defense in an indictment for murder. Once again this Court approved the M'Naghten Rule, which "was adopted as the law in Pennsylvania (Commonwealth v. Mosler, 4 Pa. 264 (1846)) and has become firmly established and imbedded in the body of the law of this Commonwealth ever since. [citing many cases, including the recent case of Commonwealth v. Novak, 395 Pa. 199, 150 A. 2d 102 (1959)]." '

. . .

". . . We hold that the psychiatric testimony offered in this case *is not admissible* (1) to absolve or exculpate and acquit a defendant of crime, *or (2) to prove a lack of specific intent to kill,* and thereby prohibit a verdict of murder of the first degree. This has always been the law of Pennsylvania. Commonwealth v. Tyrrell, 405 Pa., supra. We further hold that since the Act of December 1, 1959, P. L. 1621, 18 P.S. §4701,

---

\* Italics in *Commonwealth v. Ahearn.*

(popularly known as the Split Verdict Act), unless psychiatric testimony is introduced for the purpose of showing insanity under the M'Naghten Rule, (a) it is admissible only after guilt has been determined by a jury or Court, and (b) is relevant and admissible thereafter only for the limited purpose of aiding the jury or Court in fixing the penalty."

In *Commonwealth v. Carroll*, 412 Pa. 525, 194 A. 2d 911, the Court (with two concurring in the result) pertinently said (page 537): " '. . . *society would be almost completely unprotected from criminals if the law permitted a blind or irresistible impulse or inability to control one's self, to excuse or justify a murder or to reduce it from first degree to second degree.** In the times in which we are living, nearly every normal adult human being has moments or hours or days or longer periods when he or she is depressed and disturbed, with resultant emotional upset feelings and so-called blind impulses; and the young especially have many uncontrolled emotions every day which are euphemistically called irresistible impulses. *The Courts of Justice should not abdicate their function and duty of determining criminal responsibility to the psychiatrist.** In such event, the test will differ not only with each psychiatrist but also with the prevailing psychiatric winds of the moment.*** " '. . . Only a short time ago that concept [of irresistible impulse] was emphatically presented as an example of the "uniform" opinion of psychiatrists on criminal responsibility; and yet today, "irresistible impulse" is rejected by most psychiatrists as unsound. . . .'** [Professor] Hall, 'Psychiatry and

---

\* Italics in *Commonwealth v. Carroll*.

\*\* Notwithstanding the minority's quotations from some psychiatrists and some articles in law school reviews, it is, I repeat, a matter of common knowledge that psychiatric theories have varied widely for many years and are constantly changing and *even today are in a state of uncertainty, conflict and flux.*

Criminal Responsibility', 65 Yale L. J. 761, 762 (1956) :" State of New Jersey v. Lucas, 30 N. J. 37, 152 A. 2d 50.'

"Just as the Courts cannot abdicate to the psychiatrists the task of determining criminal responsibility in law, so also they cannot remit to psychiatrists the right to determine the intent or the state of mind of an accused at the time of the commission of a homicide."

*We again reaffirm our prior decisions* (1) that the M'Naghten Rule governs the question and issue of insanity and *(2) that testimony by psychiatrists or psychologists or others that defendant was incapable for one or more psychiatric or psychological reasons to form a specific intent to kill (a) is inadmissible on the question of guilt but (b) is admissible on the subject or issue of penalty or sentence.* To hold otherwise would not only circumvent and nullify the M'Naghten Rule but would *in practical effect* turn over to psychiatrists the determination of whether the accused was or could be guilty of murder in the first degree and thereby jeopardize Justice.

In *Commonwealth v. Rightnour*, 435 Pa. 104, 253 A. 2d 644, which was affirmed by a divided six-man Court, Chief Justice BELL (joined by Justices EAGEN and O'BRIEN) reviewed and reaffirmed all the above-mentioned decisions of the Supreme Court and requoted, with approval, the pertinent language in their respective Opinions, and there said (page 113) : "Defendant frankly states that he is opposed to the M'Naghten Rule, and frankly admits that the decision of the lower Court was in accord with the prior recent decisions of this Court. He therefore urges us to overrule Commonwealth v. Phelan, 427 Pa. 265, 234 A. 2d 540; Commonwealth v. Ahearn, 421 Pa. 311, 218 A. 2d 561, *and other recent decisions of this Court. This we decline to do, but, on the contrary, reaffirm the law set forth therein.*"

Appellant also contends that the exclusion of the psychiatric testimony is a violation of due process and equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution and that the imposition of sentence constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution. We find no merit in any of these contentions.

## Stare Decisis

Over and over again Stare Decisis has been recognized as the established rule and Law of Pennsylvania. In *Burtt Will*, 353 Pa. 217, 44 A. 2d 670, the Court said (pages 231, 232) : "This Court has always rigidly adhered to the rule of stare decisis. . . . All of the cases reciting our policy to adhere strictly to the rule of stare decisis need not be collected and reviewed. What was said by us in a few of the latest cases will suffice: Mr. Chief Justice MAXEY said in Monongahela St. Ry. v. Phila. Co. et al., 350 Pa. 603, 616, 39 A. 2d 909, 'The doctrine of stare decisis is recognized and applied by the courts of this Commonwealth. . . .' Mr. Justice HORACE STERN said in Commonwealth v. Wucherer, 351 Pa. 305, at 308, 41 A. 2d 574: 'Even were it deemed a doctrine which should no longer prevail, certainly, in the face of so venerable a history, the remedy should be sought, not in the courts, but in the legislature; the function of the former (at least where principles have become firmly imbedded in the warp and woof of judicial interpretation) being to declare what the law is, and that of the legislature to change existing law by statutory fiat'; and in Davis v. Pennsylvania Co., etc., 337 Pa. 456, at 464, 12 A. 2d 66: 'An interpretation of law consistently followed by an appellate court over so long a period that it has become fundamentally imbedded in the common law of the Commonwealth should

not be changed except through legislative enactment, which is a remedy always available and the proper one under our scheme of government. Otherwise the law would become the mere football of the successively changing personnel of the court, and "the knowne certaintie of the law", which Lord Coke so wisely said "is the safetie of all", would be utterly destroyed.' "

The doctrine of Stare Decisis was again recognized and reaffirmed and applied in *Borsch Estate,* 362 Pa. 581, 588-589, 67 A. 2d 119.

Once again appellant seeks to make a mockery of Stare Decisis, on which the House of Law was built and for centuries has been maintained. Stare Decisis is not as changeless or immutable as the Law of the Medes and the Persians. See the five exceptions set forth in my dissenting Opinion in *Niederman v. Brodsky,* 436 Pa. 401, 261 A. 2d 84. Furthermore, the law set forth in the Opinions of a Court can be changed by the Legislature.

Stare Decisis has been supported and approved by virtually every Chief Justice of Pennsylvania, including particularly Chief Justice BLACK, Chief Justice LOWRIE, Chief Justice MITCHELL, Chief Justice VON MOSCHZISKER, Chief Justice KEPHART, Chief Justice SCHAFFER, Chief Justice MAXEY, Chief Justice DREW, Chief Justice STERN, Chief Justice JONES, and the present Chief Justice, as well as Pennsylvania's recent illustrious Justice of the Supreme Court of the United States, Justice Owen J. ROBERTS, in *Smith v. Allwright,* 321 U.S. 649. In *Smith v. Allwright,* Mr. Justice ROBERTS, dissenting, said (pages 666, 669) : ". . . I have expressed my views with respect to the present policy of the court freely to disregard and to overrule considered decisions and the rules of law announced in them. This tendency, it seems to me, indicates an intolerance for what those who have composed this court in the past

have conscientiously and deliberately concluded, and involves an assumption that knowledge and wisdom reside in us which was denied to our predecessors. . . . The reason for my concern is that the instant decision, overruling that announced about nine years ago, tends to bring adjudications of this tribunal into the same class as a restricted railroad ticket, good for this day and train only."

In *Commonwealth v. Woodhouse,* 401 Pa., supra, Mr. Justice EAGEN, speaking for the Court, aptly said (pages 253, 255) : "Unquestionably, in a republican form of government as we are privileged to enjoy, order, certainty and stability in the law are essential for the safety and protection of all. Stare Decisis should not be trifled with. If the law knows no fixed principles, chaos and confusion will certainly follow. . . . *'If the question of what is a mental disease or defect is a psychiatric one, then the law has abdicated its function of determining criminal responsibility to the psychiatrist and the jury will have to accept the unopposed psychiatric view of mental disease or defect. The test will differ with the prevailing psychiatric winds of the moment'*: State v. Lucas, supra, at 68 (152 A. 2d)."

Upon this Rock of Gibraltar, all Judges, all public officials, as well as all the people of Pennsylvania, can see and know and rely on their respective rights and responsibilities, their powers, their duties, their obligations and limitations. The damaging results of abandoning or extirpating Stare Decisis, as appellant seeks to do, are multiple. (1) One of the obvious and regrettable results would be to make a decision of the Supreme Court of Pennsylvania good only until the next session of this Court. (2) Another inevitable and regrettable result is that it would multiply litigation and further delay the disposition of civil claims and the right of accused criminals to a speedy public trial

(which is ordained by Article VI of the Constitution of the United States) and thereby unquestionably jeopardize Justice. (3) Another regrettable result is the uncertainty it would thereby create in every person's life—it would leave people's knowledge of their rights and responsibilities, their powers and their duties suspended like Mohammed's coffin between Heaven and earth.

We have carefully considered all of appellant's contentions—both Constitutional and otherwise—and find no merit in any of them.

For each and all of these reasons, I would affirm the Judgment of Sentence.

Mr. Justice EAGEN and Mr. Justice O'BRIEN concur in the result.

———

OPINION IN SUPPORT OF REVERSAL OF JUDGMENT BY MR. JUSTICE ROBERTS:

An evenly divided Court today holds that a defendant who concedes his "sanity" under the M'Naghten rule may not introduce psychiatric evidence tending to prove that he was incapable of acting with the deliberateness and premeditation required for guilt of murder in the first degree. This ruling is unsupportable.

This issue is no stranger to us. In *Commonwealth v. Phelan*, 427 Pa. 265, 234 A. 2d 540 (1967), and in *Commonwealth v. Ahearn*, 421 Pa. 311, 218 A. 2d 561 (1966), this Court affirmed the exclusion of medical evidence similar to that rejected by the trial court here. And the last time we faced the issue, this Court was also evenly divided. *Commonwealth v. Rightnour*, 435 Pa. 104, 253 A. 2d 644 (1969). Although I have previously set forth my views on this issue in my dissenting opinions in these cases, I am compelled to reiterate them here.

It should be noted initially that the opinion in support of the affirmance of the judgment of sentence can draw little support from the principle of stare decisis. This is not a situation where "it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S. Ct. 443, 447 (1932) (BRANDEIS, J., dissenting). "*Stare decisis* is a principle of adherence, for the sake of certainty and stability, to precedents once established. But it applies primarily to decisions, . . ., which invite reliance and on the basis of which men order their affairs, e.g., in the field of contract or property rights." *Smith v. Brennan,* 31 N.J. 353, 361, 157 A. 2d 497, 501 (1960). See also *Greene v. Rothschild,* 68 Wash. 2d 1, 8, 414 P. 2d 1013, 1015 (1966); *Falzone v. Busch,* 45 N.J. 559, 214 A. 2d 12 (1965). There is certainly no such reliance involved here. Furthermore, "stare decisis should not govern in a case like this where a man's life is involved." *United States ex rel. Fong Foo v. Shaughnessy,* 234 F. 2d 715, 718 (2d Cir. 1955).

It should also be noted preliminarily that today's decision aligns this Commonwealth against the trend of modern authority and the conclusions of many thoughtful commentators. The Supreme Courts of California and New Jersey, two states which formerly followed a rule similar to that which we announced in our *Ahearn* decision, have subsequently unanimously repudiated their old law and now allow the admission of evidence of "diminished responsibility." See *State v. DiPaolo,* 34 N.J. 279, 168 A. 2d 401 (1961); *People v. Wells,* 33 Cal. 2d 330, 202 P. 2d 53 (1949) (dissents on other grounds), followed in *People v. Henderson,* 60 Cal. 2d 482, 35 Cal. Rptr. 77, 386 P. 2d 677 (1963), and *People v. Gorshen,* 51 Cal. 2d 716, 336 P. 2d 492 (1959). Cf. *Stewart v. United States,* 214 F. 2d 879 (D.C. Cir. 1954). Diminished responsibility is now

cognizable in English homicide cases. English Homicide Act, 1957, 5 & 6 Eliz. II, c. 11, §2(1); see *Regina v. Dunbar*, 41 Crim. App. R. 182 (1957). And Irish legal thought reveals a similar trend. See, O'Doherty, Criminals, Men, and Responsibility. See also A.L.I. Model Penal Code, §4.02(1) (Proposed Official Draft, 1962). The only other near-contemporary decision to the contrary, *Fisher v. United States,* 149 F. 2d 28 (D.C. Cir. 1945), *aff'd on other grounds,* 328 U.S. 463, 66 S. Ct. 1318 (1946), has met with apparently unanimous disfavor. See Keedy, A. Problem of First Degree Murder: *Fisher v. United States,* 99 U. Pa. L. Rev. 267 (1950); Weihofen and Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L.J. 959 (1947); Taylor, Partial Insanity as Affecting the Degree of Crime—A Commentary on *Fisher v. United States,* 34 Cal. L. Rev. 625 (1946). Moreover, the Court of Appeals for the District of Columbia Circuit has subsequently implied that it would not have allowed *Fisher* to stand had it not replaced the M'Naghten rule with the *Durham* test. See *Stewart v. United States,* supra.

One of the hallmarks of the law of evidence is the concept of relevancy, and the excluded psychiatric testimony, according to the terms of its offer, was certainly relevant. When an accused pleads guilty to murder generally, the Commonwealth, in order to raise the offense to murder in the first degree, must establish beyond a reasonable doubt that the slaying was "willful, deliberate and premeditated . . . ." Act of June 24, 1939, P. L. 872, as amended, 18 P.S. §4701.[1]

---

[1] The complete statutory definition of murder in the first degree is: "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree." Act of

With the aid of Dr. Moore's testimony, appellant was prepared to attempt to disprove or, at least, to create a reasonable doubt that he killed Green deliberately or with premeditation, thereby negating an essential element of the crime of first degree murder. "If the mental state requisite to a given crime is absent, the crime has not been committed. To what cause the absence of such mental state is to be attributed would seem immaterial." Weihofen and Overholser, supra at 962. See A.L.I. Model Penal Code, §4.02(1), comment (Proposed Official Draft, 1962) ; *State v. DiPaolo*, supra.

The proposition that a criminal defendant has a right to present relevant and otherwise admissible evidence is fundamental. 1 Wigmore on Evidence §§9-10, at 289-95 (1940) ; McCormick, Evidence §151, at 314 (1954). And there is no sound reason to forbid the admission of relevant psychiatric evidence that a defendant did not possess the mental state requisite for the commission of a specific crime.

There is certainly no basis upon which to hold this sort of psychiatric evidence incompetent. It is no more inherently unreliable than the myriad other species of lay and expert opinion testimony daily received in the trial courts of this Commonwealth. Although the science of the human mind is inevitably less exact than the disciplines of chemistry or physics, the work of psychiatrists is more than mere guesswork. Indeed, psychiatric testimony is routinely considered in determining whether an accused is "insane" under the M'Naghten rule, and it is likewise admissible to assist in fixing sentence. *Commonwealth v. Elliott*, 371 Pa. 70,

---

June 24, 1939, P. L. 872, as amended, 18 P.S. §4701. There is no suggestion in the record that the killing of Green was committed by poison, lying in wait, or in the perpetration or attempt to perpetrate any of the enumerated felonies. Hence, first degree murder could be predicated only upon a finding that the killing was "willful, deliberate and premeditated . . . ."

89 A. 2d 782 (1952). If such evidence is competent in these other contexts, it should be deemed equally competent here.

That such evidence must frequently be based upon the possibly self-serving statements of the defendant himself presents no serious difficulty. There is substantial evidence that "the insane do not lie—they expose the truth with alarming candor." Roche, Truth Telling, Psychiatric Expert Testimony and the Impeachment of Witnesses, 22 Pa. B. Q. 140, 146 (1951). The allowance of psychiatric testimony unrelated to the M'Naghten defense will not unduly shift the determination of guilt or inocence from judges and juries to scholars of the human psyche. Ultimately the final decision will be made not by the testifying psychiatric expert but by the trier of fact. Furthermore, there is a growing awareness among psychiatrists of the difficulties involved in their attempted contribution to criminal justice, and progress is being made in developing procedures by which psychiatric testimony can be even more useful to the trier of facts. See, e.g., Guttmacher, Why Psychiatrists Do Not Like to Testify in Court, 20 Bull. of the Menninger Clinic 300, 306 (1956).

Finally, the fact that this Commonwealth has adopted the M'Naghten rule does not militate in favor of today's ruling. Whether or not we continue in the future to adhere to M'Naghten, there is no incompatibility between it and the admission of psychiatric testimony on degree of guilt. These two doctrines coexist peacefully in a number of other jurisdictions, including California and New Jersey. See, e.g., *People v. Henderson,* supra; *State v. DiPaolo,* supra; *Battalino v. People,* 118 Colo. 587, 199 P. 2d 897 (1948); *State v. Gramenz,* 256 Iowa 134, 126 N.W. 2d 285 (1964).

Obviously, a mentally disturbed killer is no less dangerous to society because of his mental disturbance. Indeed, the danger which he poses to society might be

all the greater because of his mental disease or disorder. However, to attempt to respond to this danger by excluding relevant and competent evidence that an accused is not guilty of murder in the first degree is improper, unnecessary and ineffectual. Total acquittal is not at issue here; that is governed by M'Naghten. If a shorter sentence results because of acquittal of a higher offense, the Mental Health and Retardation Act provides the Commonwealth with an ample means of effecting the continued confinement of a still dangerous individual.[2] Moreover, the unwarranted imposition of the more severe sanctions of first degree murder upon one who lacked the mental capacity to commit first degree murder might actually increase the danger to society. As most eloquently stated by Dr. Karl Menninger:

"But you may ask—the man was dangerous, immoral, ruthless, unpredictable—why *not* eliminate him?

"For the reasons that . . . . Eliminating one offender who happens to get caught *weakens* public security by creating a false sense of diminished danger through a definite remedial measure. Actually, it does not remedy anything, and it by-passes completely the real and unsolved problem of *how to identify, detect, and detain potentially dangerous criminals.*

"What kind of creature was this anyway? And how did he get that way? What gave him the wild and fearful idea? What was he most afraid of? What was burning inside him? What *might* have deterred him? . . . How do patterns of thought and action such as this get started, and how can the rest of us become alerted in time to prevent such tragedies?" Menninger, The Crime of Punishment 108-109 (1968).

---

[2] See the civil commitment procedures provided by the Mental Health and Retardation Act of 1966, Special Sess. No. 3, October 20, P. L. 96, art. IV, §§404-406, 50 P.S. §§4404-4406.

For all of the foregoing reasons, the judgment of sentence should be vacated and the case remanded for a new degree of guilt hearing.

Mr. Justice JONES and Mr. Justice POMEROY join in this opinion.