UNITED STATES of America,
Plaintiff-Appellee,

v.

James CASTEEL, Defendant-Appellant.

No. 72–1644.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 10, 1973.

Decided March 29, 1973.

Edward H. Funston, Asst. U. S. Atty. (Robert J. Roth, U. S. Atty., Bruce E. Miller, and Richard L. Meyer, Asst. U. S. Attys., on the brief), for plaintiff-appellee.

Sam A. Crow, of Crow & Skogg, Topeka, Kan., for defendant-appellant.

Before BREITENSTEIN, McWILLIAMS and BARRETT, Circuit Judges.

McWILLIAMS, Circuit Judge.

James Casteel was convicted by a jury of transporting in interstate commerce two forged checks in violation of 18 U. S.C. § 2314. He now appeals and we affirm.

It was stipulated at trial that Casteel caused to be transported in interstate commerce from Topeka, Kansas, to Kansas City, Missouri, the two checks in question, cashing one check at Falley's Market, in Topeka, and the second at Sutton's Market, also in Topeka. It was further stipulated that each of the checks had been forged by one Thomas Dorsey. Accordingly, the only real issue in the case was whether Casteel knew at the time he cashed the checks that they were forged or falsely made instruments.

Evidence adduced upon trial disclosed that one Dee Osborn had her purse stolen while working at a Montgomery Ward store in Topeka. In Miss Osborn's purse was her checkbook containing blank checks on a Kansas City, Missouri, bank. The two checks which formed the basis for the present prosecution were identified by Dee Osborn as being hers, each bearing her printed name on its face. Each check also bore a maker's signature which purported to be that of Miss Osborn. Miss Osborn denied, however, that such purported signatures were in fact hers, and testified that she had given no one permission to sign her name for her.

As above indicated, it was stipulated that one Thomas Dorsey had made out the face of each of the two checks, forging in each instance the signature of Dee Osborn as the maker of the check. James Casteel was the named payee on each check, and he in turn endorsed each check as the payee in cashing them at the two markets in Topeka.

As mentioned, the only real issue in the case was whether Casteel had so-called guilty knowledge when he cashed the two checks, i. e., knowledge of the falsity of the checks. To establish this element of the offense, the Government relied chiefly on the testimony of two lady employees of a local Topeka concern known as Research & Data Corporation, hereinafter referred to as R & D. The nature of that company's business was described by one witness as follows:

"Our Research & Data works with merchants, and business and law enforcement on bad checks, shoplifting and other similar types of losses. Primary purpose is the prevention of these crimes. The businesses do send in their losses such as checks to us to work on. We are employed by the business on a monthly employment basis like an employee * * *."

The two employees of R & D testified that the two checks in question were referred to them by the two markets which had initially cashed them, the

checks having been returned to the markets after payment had been stopped. One employee testified that she telephoned Casteel and asked him to drop into her office and discuss the two checks in question. Several weeks later Casteel did appear at the offices of R & D where he was interviewed concerning his knowledge of the two transactions. Both of these employees testified that on that occasion Casteel stated that it was he who had endorsed the two checks and that he knew the "checks were bad when he cashed them." According to these two witnesses, Casteel was advised that what he had said could be used against him in court, and that he replied that he knew it. Casteel then left the offices of R & D and was not arrested till sometime later.

Casteel testified at his trial that he did *not* know the checks were forged when he cashed them, though he did know they were forged when he was interviewed by the employees of R & D. Casteel then went on to testify that the checks in question were given him by his friend, Thomas Dorsey, in exchange for some auto parts. Casteel explained the fact that the maker's signature on each of the two checks was purportedly that of Dee Osborn, and not that of Thomas Dorsey, by testifying that he just assumed that Miss Osborn was a friend of Dorsey and was buying the parts for him. Casteel's testimony was corroborated to some degree by his sister and his mother. Neither the Government nor Casteel called Thomas Dorsey as a witness, a fact that will be referred to in more detail in a moment.

At trial, objection was made to the admission into evidence of the statements made by Casteel to the employees of R & D on the ground that Casteel was not given a full and effective warning of his constitutional rights at the outset of the interrogation process as prescribed by Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). In fact, says counsel, Casteel was given no warning, let alone a full and effective one. This objection was overruled by the trial court and the principal contention in this court concerns the propriety of that ruling.

At the outset it is to be noted that R & D is a private enterprise, and not a public law enforcement agency. According to the record, R & D received the two checks here in question from the two markets which had cashed the checks, each market being a subscriber to the services afforded by R & D. The latter then made its investigation of the matter, which included an interview with Casteel, with the checks in question being ultimately forwarded to the FBI. The two employees of R & D had no special powers of arrest and their testimony was that they could only ask Casteel to come to their offices, which he did after a delay of several weeks, and that at the conclusion of the interview Casteel was free to leave, which he did. There is nothing in the record before us to indicate that R & D in its investigation of the matter was acting as an alter ego of any law enforcement agency, or was in anywise in collusion with any such agency. Nor is there any contention that the statements themselves were involuntarily given by Casteel. Rather, it is the position of counsel that Casteel's statement to the two employees of R & D should have been excluded solely because of the failure to give a *Miranda* warning. On this state of the record we hold that there was no requirement that a *Miranda* warning be given Casteel by the employees of R & D, and that accordingly the trial court did not err in admitting into evidence the admissions thus attributed to Casteel.

■ As we read Miranda v. Arizona, *supra*, the necessity of fully and effectively informing one of his constitutional right to remain silent, or obtain the presence of counsel, arises when a custodial interrogation by law enforcement officers is about to commence. The Constitution does not protect an alleged criminal against his own failure to remain mute in every environment and under all circumstances. Stowers v. Unit-

ed States, 351 F.2d 301 (9th Cir. 1965). Since the instant case does not involve a custodial interrogation by law enforcement officers, we deem *Miranda* to be inapplicable. To hold that *Miranda* does have applicability would require an extension of that rule, and we are disinclined to thus extend. *See* United States v. Cowley, 452 F.2d 243 (10th Cir. 1971), where we held that a *Miranda* warning was not needed where the statements in question, though given to the police, were made before the defendant was taken into custody or otherwise deprived of his freedom of action in any significant way.

Two cases from other Circuits are directly in point. In United States v. Bolden, 461 F.2d 998 (8th Cir. 1972), it was held that a statement given a store security officer was not inadmissible evidence because of the failure to give a *Miranda* warning in view of the fact that the defendant when he made the statement was not under "custodial interrogation" because: (1) defendant's freedom of action had not been restrained in any significant way; (2) his statements were in fact voluntarily given; and (3) the statements were not given to a "law enforcement official." In United States v. Antonelli, 434 F.2d 335 (2d Cir. 1970), it was held that the Fifth Amendment privilege against self-incrimination does not require the giving of a *Miranda* warning by private citizens or security personnel employed thereby who take a suspect into custody. We subscribe to the result and reasoning in each of those cases. *See also* in this regard: Note, Criminal Law Admissibility of Confessions or Admissions of Accused Obtained During Custodial Interrogation by Non-Police Personnel: Are the Miranda Warnings Required?, 40 Miss.L. J. 139 (1968); and Note, Confessions Obtained Through Interrogations Conducted by Private Persons, Investigators, and Security Agents, 4 Willamette L.J. 262 (1966).

Our holding is in line with our reasoning in the recent case of United States v. Harding, 10th Cir., 475 F.2d 480, 1973. There, we held that the Fourth Amendment prohibition against "unreasonable searches" did not apply to searches by "private citizens not acting in collusion with federal officers."

 In the instant case, there is the suggestion that the two employees of R & D to whom Casteel volunteered his incriminating statements were "acting in consort with the FBI." It is sufficient to say that the record simply does not support such conclusion. The fact that the checks in question were eventually forwarded to the FBI, or that the two employees did from time to time in the course of their duties converse with various law enforcement officers is insufficient to support the suggestion that in calling Casteel into their office and making inquiry about the checks, the two employees of R & D, in the language of *Antonelli*, had some sort of a "de facto connection with any public law enforcement agency."

 Counsel also argues that the judgment should be reversed because of improper closing argument by the Government's attorney. In his closing argument, counsel for Casteel chided the Government for failing to call as its witness Thomas Dorsey, the stipulated forger of the two checks. In response thereto the Government attorney noted that Dorsey was Casteel's friend and wondered if Dorsey was such a good friend of Casteel's, why he (Dorsey) "isn't here testifying for him." In this regard counsel argues that by such comment the Government's attorney improperly placed on Casteel the overall burden of proof, or at least the burden to produce Dorsey.

 This particular matter is without merit. The comment was not improper. Counsel does have the right to reply to an argument raised by his opposing advocate. United States v. Guajardo-Melendez, 401 F.2d 35 (7th Cir. 1968).

In United States v. Panepinto, 430 F. 2d 613 (3d Cir. 1970), cert. denied sub nom. Orangio v. United States, 400 U.

S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1970), defense counsel, as in the instant case, in closing argument took the prosecutor to task for failure to call a certain witness who conceivably could have refuted the defendant's testimony. In that case, it was held that the prosecutor was justified in thereafter pointing out that the defendant also had the power to subpoena the witness in question to corroborate his story, had he been so inclined. The comment by the Government attorney in the instant case was equally justified.

Judgment affirmed.