UNITED STATES ex rel. Vaughan
BOOKER H–9095, Appellant,

v.

Robert JOHNSON, Superintendent, State
Correctional Institution at Graterford.

No. 73–1066.

United States Court of Appeals,
Third Circuit.

Argued May 18, 1973.

Decided Sept. 28, 1973.

David Kairys, Kairys & Rudovsky, Philadelphia, Pa., for appellant.

Arlen Specter, Dist. Atty., Judith Dean, Asst. Dist. Atty., Philadelphia, Pa., for appellee.

Before VAN DUSEN, GIBBONS and ROSENN, Circuit Judges.

OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Petitioner Booker appeals from the July 31, 1972 district court order which denied his petition for habeas corpus without a hearing. We affirm the order of the district court.

Booker is imprisoned for the murder of his wife. He pleaded guilty generally to this murder, and the three-judge court which accepted his plea determined, after a trial on the degree of guilt, that the murder was first degree. The court sentenced him to life. He appealed this sentence to the Pennsylvania Supreme Court and, while such appeal was pending, as a result of a joint petition filed by defendant's counsel and the district attorney, the case was remanded for an evidentiary hearing to consider petitioner's contentions that the guilty plea was invalid and that he had been denied his constitutional right to the ef-

fective assistance of counsel. Petitioner also filed while such appeal was pending a petition seeking relief under the Post-Conviction Hearing Act, which was consolidated for hearing with the remanded case. At this hearing, his contentions as to the voluntariness of his plea and the effectiveness of his counsel were rejected in an opinion by Judge Doty. See Commonwealth v. Booker, Opinion of 12/20/71 (C.P.Phila. Criminal Section, Dec. Term 1967 No. 1639). The Pennsylvania Supreme Court affirmed *per curiam*, 447 Pa. 587, 287 A.2d 899 (1972).

Booker then filed a petition in the district court for habeas corpus. The district court, "after careful and independent consideration of relator's petition, the state court records and after review of the Report and Recommendation of the United States Magistrate," adopted this report, which had concluded that the post-conviction hearing judge had reliably found the facts and correctly applied the law.

Early on the morning of October 23, 1967, Booker killed his wife by shooting three hunting arrows and two target arrows variously into her neck, left breast and right side. He subsequently wrote on a wall that he also tried to strangle his infant son, but revived him. Booker then called the police who arrived, found his wife's body, and took him into custody. Later that morning he made a statement to police relating the circumstances of the killing.

Two counsel were appointed for Booker, Abraham J. Brem Levy and Anthony Minisi. They obtained an offer from the district attorney's office that, in exchange for a guilty plea, the district attorney's office would certify the murder as second degree and recommend seven to fourteen years. Booker, however, refused to accept this arrangement and discharged the two attorneys. At his post-conviction hearing Booker stated that his reason for this action was his

desire to present the defense of insanity to a jury.[1]

██ Two new attorneys were appointed, Richard D. Atkins and Armand Della Porta (now Judge Della Porta). It is with respect to the conduct and advice of these men that Booker now petitions for relief. His central factual claims are, first, that these counsel believed, and, second, that they told him, that if he pleaded guilty he would be allowed to present evidence of diminished responsibility at the time of the killing and that this evidence would negate the intent necessary for a finding of first degree murder. The then-existing law, Booker argues, was clearly to the contrary. Therefore, because of this ignorance or gross misappraisal of Pennsylvania law, counsel were incompetent and did not render him effective assistance. United States ex rel. Green v. Rundle, 434 F.2d 1112, 1113 (3d Cir. 1970); United States v. Moore, 432 F.2d 730, 736–737 (3d Cir. 1970). On the same reasoning petitioner contends that their advice to him did not fall "within the range of competence demanded of attorneys in criminal cases," McMann v. Richardson, 397 U.S. 759, 770–771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970),[2] and rendered his guilty plea unintelligent and void. *See* United States ex rel. Crosby v. Brierley, 404 F.2d 790, 797–798 n. 19 (3d Cir. 1968).

At the time of trial in February 1970, the relevant law of Pennsylvania consisted of three decisions: Commonwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966); Commonwealth v. Phelan, 427 Pa. 265, 234 A.2d 540 (1967); and Commonwealth v. Rightnour, 435 Pa. 104, 253 A.2d 644 (1969). In *Ahearn,* the defendant had pleaded guilty to murder generally, and a judge subsequently determined that the murder was in the first degree. The Pennsylvania Supreme Court affirmed, in a reaffirmation of the M'Naughten Rule of distinguishing right from wrong and a rejec-

1. Post-Conviction Hearing Notes of Testimony (PCHNT) 11.

2. *Accord,* Tollett v. Henderson, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

tion of the doctrine of diminished responsibility. The court held that an inability to control oneself, whether labeled "irresistible impulse" or "diminished responsibility," was legally insufficient to reduce first degree murder to second degree by negating any specific intent to kill. Indeed, the court ruled that psychiatric evidence was inadmissible unless offered to show insanity under the M'Naughten Rule. *Ahearn* was followed in *Phelan*. In *Rightnour*, the defendant's conviction by a jury of first degree murder was upheld despite the trial judge's refusal to allow a psychiatrist to testify about the defendant's state of mind, which was conceded not to meet the M'Naughten Rule.

It should be noted, however, that the affirmance in *Rightnour* was by an equally divided court. Thus, the state of the law regarding diminished responsibility was in something of a state of flux. In Commonwealth v. Weinstein, 442 Pa. 70, 274 A.2d 182 (1971), *Ahearn* was followed, again by an equally divided vote. Finally, *Ahearn* was overruled by Commonwealth v. McCusker, 448 Pa. 382, 292 A.2d 286 (1972).

At the post-conviction hearing held in June 1971, before *McCusker,* Mr. Atkins indicated that he believed that evidence of diminished responsibility was admissible to negate the intent requisite for first degree murder. *See* PCHNT 43–49. He did not, however, indicate why he believed this to be so. We have not been able to find any direct support in the record for the finding of the post-conviction hearing judge that Atkins' belief was based on the 3-3 vote in *Rightnour.* No mention of these cases appears in the transcript of the hearing or in the transcript of the trial. It is also unclear—and the judge made no finding on this question—what he and his co-counsel told Booker on this subject. Atkins,[3] Booker,[4] and the Reverend Frederick Powers, Jr.,[5] a prison chaplain who attended a number of meetings of Booker and his counsel, were all unable to recall exactly what was said about the use of the evidence of Booker's diminished responsibility. They might have told Booker that he had an unquestionable right to present his evidence, or they might have told him only that they thought they had a reasonable chance of persuading the Pennsylvania courts to admit such evidence.

It is most instructive to elaborate on the reasoning of the post-conviction hearing judge before presenting our own basis for deciding this case. Having turned down the plea bargain, Booker had three options: plead not guilty; plead not guilty by reason of insanity; and plead guilty, but try to present evidence of diminished responsibility. An important factor in choosing among these options was that Atkins regarded the judge to whom Booker would have been assigned for jury trial as increasing considerably the likelihood of a conviction for first degree murder.[6] Paramount, of course, was the gruesome nature of the killing, amply demonstrated by a series of photographs taken by police of the dead wife's body with the arrows still in it. Therefore, while there was some evidence of provocation sufficient for establishing manslaughter,[7] a plea of not guilty to murder would have been extremely risky.

3. *See* PCHNT 47–48.

4. *See* PCHNT 27.

5. *Cf.* PCHNT 74, 76.

6. The record makes clear that Atkins articulated this threat to Booker. *See* PCHNT 57–58 (testimony of Atkins); PCHNT 33–34 (testimony of Booker).

7. Booker told Rev. Powers, and later his lawyers, that when he arrived at his house on October 23rd he saw a man leaving; he was told by his wife that this man was the real father of his son. It must be noted, though, that he did not offer this explanation until well after the crime, that it conflicted with the confession given the police, that it could of course not be corroborated by the wife, and that there was apparently no other evidence of infidelity on the part of his wife. *See* PCHNT 68–69.

The major difficulty with an insanity plea was that Atkins and Della Porta did not believe the evidence was sufficient to meet the M'Naughten Rule.[8] The post-conviction hearing judge found that this assessment was reasonable and we agree. We note that at Booker's trial on degree of guilt, Dr. Louis C. Alikakos, the psychiatrist whose opinion of Booker was crucial to an insanity defense, would not state that Booker did not know right from wrong.[9] Unless Booker's evidence could meet the M'Naughten Rule, it would, under *Ahearn* and *Rightnour*, have been no more admissible before a jury than at a three-judge trial, following a guilty plea, on the degree of guilt. Consequently, the third option, which was chosen, seems preferable to the other two.

We need not, however, rely upon this line of reasoning to reach our decision. For present purposes we shall assume as true the factual contentions which Booker attempted to prove at the post-conviction hearing, even though the record does not unequivocally establish their correctness.[10] That is, we assume that Della Porta and Atkins told Booker that he could present psychiatric testimony on diminished responsibility. After having read the entire trial record carefully we are convinced that, whether or not the court should have been faithful to *Ahearn* and the other Pennsylvania Supreme Court cases, it did allow Booker to present such testimony on diminished responsibility.[11] The court permitted Dr. Alikakos to testify at length[12] with minimal restriction.[13] The court did not cut off Atkins when, in his closing argument, he clearly asserted that the evidence of diminished responsibility prevented a determination of first degree murder.[14] On the contrary, in a subsequent colloquy with Della Porta the court indicated its understanding of Atkins' argument.[15] The

---

8. *See* PCHNT 43–44.

9. *See* N.T. 154–55.

10. Because we assume these contentions to be true, a further evidentiary hearing on them would serve no purpose. In addition, we think that the record of the trial on guilt so clearly demonstrates what the state trial court did as regards the psychiatric testimony, that any hearing as to what the court did would also be pointless.

11. In his brief at 7, and his reply brief at 4, Booker calls our attention to the following pages as support for the proposition that the court did not consider the psychiatric evidence: N.T. 74–75, 154–55, 158, 162–63, 167–68, 270. We have rechecked these passages and find them unpersuasive.

12. The doctor's testimony is transcribed at N.T. 125–61.

13. *See* N.T. 125–26; 270–71.

14. *See* N.T. 295–313, especially 295–96, 312.

15. After Mr. (now Judge) Della Porta argued that an argument of relator with his wife, during which she had incorrectly accused him of being out with another woman, furnished provocation sufficient to reduce the degree of guilt to voluntary manslaughter, Judge Nix rejected the argument that such "legal provocation" was present but went on to say at N.T. 327:

"Judge Nix: . . . I had taken from Mr. Atkins' argument that he was pointing out that this was to negate the specific intent to kill, which would be a reasonable argument under the circumstances."

Again, at 329, this colloquy appears:

"Mr. Della Porta: That certainly takes away any possible planning or intent or—

"Judge Nix: That is going back to Mr. Atkins.

"Mr. Della Porta: —or willfulness.

"Judge Nix: That is as to the issue of first or second degree. All right."

See N.T. 327–29. At N.T. 342–43, the prosecutor argued that:

"With respect to irresistible impulse and diminished responsibility, Your Honor, I don't think they have been made out."

See also N.T. 345. In Mr. Atkins' rebuttal argument at N.T. 346, he concluded at N.T. 346–47:

"[W]e honestly feel that this was the result of a mind which was diminished in its capacity, and that you can feel free to take this into consideration. And that all of the circumstances should allow—under all the circumstances that the presumption of second degree should not be raised to first degree."

Also, Mr. Atkins testified during the post-conviction hearing, not that the state trial court had not considered the evidence of diminished responsibility on the issue of the

court reached a result unfavorable to Booker not because it failed to consider his defense, but rather because it did not accept the contention that the evidence established that relator had such diminished responsibility that it negated the intent required for first degree murder. That this was the court's reasoning is clearly demonstrated by, for example, its suggestion that Booker wrote the message about his son on the wall in a clever attempt to lay a foundation for a future insanity defense.[16]

We cannot agree that the relator is entitled to an evidentiary hearing on this record and believe that the cases cited at page 2 of the dissenting opinion of Judge Gibbons are significantly different from this case. The December 20, 1971, opinion of the state court referred to at page 2 above recites that "the case was remanded by the Pennsylvania Supreme Court for an evidentiary hearing to consider the claims raised by the defendant, namely, whether his guilty plea was valid; whether he was deprived of his constitutional right to be represented by competent counsel." That court found, *inter alia*, at pages 4 and 6, respectively:

> "Thus we conclude, and find as a fact, that the defendant entered his guilty plea knowingly, intelligently and voluntarily and such a plea was valid.
>
> . . . . . .
>
> "Therefore, the only reasonable election for defendant and his counsel was to plead guilty to murder generally and present evidence which would convince a three-judge trial court or the Pennsylvania Supreme Court that defendant had a diminished responsibil-

ity at the time of the commission of the offense.

. . . . . .

> "We conclude, therefore, that under the facts and circumstances in this case there was some *reasonable basis* for the defendant to plead guilty to murder generally as he did. Therefore, we find as a fact that defendant was not deprived of his constitutional right to representation by competent counsel; on the other hand, his trial counsel were diligent and competent in their representation of him." (Emphasis in original.)

See 28 U.S.C. § 2254(d); Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Under these circumstances, the following language of Mr. Justice Pitney in Frank v. Magnum, 237 U.S. 309, 333–334, 35 S.Ct. 582, 590, 59 L.Ed. 969 (1915), seems particularly applicable:[17]

> " . . . [T]his does not mean that [the state court] decision may be ignored or disregarded. To do this . . . would be not merely to disregard comity, but to ignore the essential question before us, which is not the guilt or innocence of the prisoner, or the truth of any particular fact asserted by him, but whether the state, taking into view the entire course of its procedure, has deprived him of due process of law. This familiar phrase does not mean that the operations of the state government should be conducted without error or fault in any particular case. . . ."

In commenting on this language, Professor Bator has said in "Finality in Federal Criminal Law and Federal Ha-

---

intent required for first degree, as opposed to second degree, murder but that (PCHNT 48) "[a]pparently, the court didn't believe it [the contention of diminished responsibility]."

16. *See* N.T. 297–305 (especially 304–05), 319. We note that Booker does not contend that Atkins and Della Porta guaranteed that the court would accept his evidence. *See* brief at 8: "Mr. Booker was erroneously advised

that the evidence would be received, considered, and, if believed, he *would not be convicted of first degree murder*" (emphasis in original). Such an argument would be hard to establish. See United States ex rel. Curtis v. Zelker, 466 F.2d 1092, 1098 (2d Cir. 1972).

17. But *cf.* "Developments in the Law, Federal Habeas Corpus," 83 Harv.L.Rev. 1038, 1055–1062 (1970).

beas Corpus for State Prisoners," 76 Harv.L.Rev. 441 (1963), at 487:

".  .  . [T]he *Frank* opinion does, concededly, state what I conceive to be simple common sense but which others may regard as restrictive: that the fact that an unbiased court of competent jurisdiction has previously adjudicated, through a full and fair litigation, the merits of whether a defendant's federal rights were violated is crucially relevant to the question whether his detention may on habeas corpus be considered unlawful because he was denied due process of law. I regard this as common sense because it *directs* the inquiry on habeas corpus to the meaningful question whether the totality of state process assures us of a reasoned probability that justice was done, rather than whether in some ultimate sense the truth was in fact found."[18]

■ One final contention of Mr. Booker—that he was denied effective assistance of counsel when at the trial Atkins and Della Porta waived all objection to the admission of his confession —is without merit.[19]

The order of the district court will be affirmed.

GIBBONS, Circuit Judge (dissenting).

In this appeal from an order denying a writ of habeas corpus without an evidentiary hearing a state prisoner contends that his guilty plea was induced by the representation of his attorneys that in his Pennsylvania degree of guilt hearing the court would consider evidence of diminished responsibility. As the majority opinion makes clear, if such a representation was made by his attorneys, it was a misstatement of the then governing Pennsylvania law. Commonwealth v. Weinstein, 442 Pa. 70, 274 A.2d 182, cert. denied, 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 (1971); Commonwealth v. Rightnour, 435 Pa. 104, 253 A.2d 644 (1969) (per curiam); Commonwealth v. Phelan, 427 Pa. 265, 234 A.2d 540 (1967), cert. denied, 391 U.S. 920 (1968); Commonwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966). The fact that such advice anticipated the result in Commonwealth v. McCusker, 448 Pa. 382, 292 A.2d 286 (1972), which overruled the *Ahearn* prohibition against consideration of such evidence in a degree of guilt hearing, is irrelevant for present purposes. The issue is the effect of such a misstatement of the then applicable law on the voluntariness of the guilty plea.

The majority opinion also makes clear that the state court record would not support a finding by the habeas corpus court that the alleged misstatement of the law did not take place. *See* 28 U.S. C. § 2254(d)(1), (3), (6). As Judge Van Dusen puts it:

"They might have told Booker that he had an unquestioned right to present his evidence, or they might have told him only that they thought they had a reasonable chance of persuading the Pennsylvania courts to admit such evidence."

Thus, if the outside-the-record misstatement of the law took place and bears upon the voluntariness of the guilty plea, an evidentiary hearing should have been held in the habeas corpus court.

18. This language of Professor Bator, 76 Harv.L.Rev. at 525, seems particularly applicable to this record:

"I rest partly on the federalist premise, that the abrasions and conflicts created by federal interference with the states' administration of criminal justice should be avoided in the absence of felt need, where the institutional necessities are as dubious as they seem to me to be in this case. I also reason from the very real claims which the need for finality and repose seem to me to make on the criminal process, claims particularly strong in view of what I consider to be philosophically faulty premises about justice which are often at the heart of the demand that we repeat inquiry endlessly to make sure that no mistake has been made."

19. *See* PCHNT 53–54.

Fontaine v. United States, 411 U.S. 213, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973) (per curiam); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Moorhead v. United States, 456 F.2d 992 (3d Cir. 1972); United States ex rel. Davis v. Yeager, 453 F.2d 1001 (3d Cir. 1971).

The majority opinion overcomes this difficulty, however, by assuming as true that the petitioner's attorneys represented to him that in the degree of guilt hearing the court would receive and consider evidence of diminished responsibility. It suggests that the degree of guilt hearing court did receive such evidence, and rejected the defense on the merits. As the majority puts it:

"The court reached a result unfavorable to Booker not because it failed to consider his defense, but rather because it did not accept the contention that the evidence established that relator had such diminished responsibility that it negated the intent required for first degree murder."

Here, the issue is fudged by an ambiguity. Does this mean that, contrary to *Weinstein, Rightnour, Phelan* and *Ahearn,* the degree of guilt hearing court considered evidence of diminished responsibility to be relevant on degree of guilt, and ruled that the evidence established no such diminished responsibility? Or does it mean that the court received such evidence in the nature of an offer of proof, but rejected it on the merits as irrelevant to degree of guilt, as required by *Weinstein, Rightnour, Phelan,* and *Ahearn?* If the latter, then accepting petitioner's factual representations, there was still a material misstatement of the law, and the effect of that misstatement on his guilty plea still would have to be determined. Only if the state court record adequately establishes that the degree of guilt hearing court considered the tendered evidence of diminished responsibility in determining degree of guilt would the misstatement of Pennsylvania law become, as the majority opinion suggests, inoperative.

I have read the same state record. It does not establish that the degree of guilt hearing court considered evidence of diminished responsibility in determining degree of guilt.

The defense offered the testimony of Albert Levitt, Chief Psychologist (tr. 74–93), and of Dr. C. Fred Hering III, Director of the Psychiatric Division, Philadelphia Common Pleas Court (tr. 93–107) in an effort to establish that petitioner was psychotic at the time he made a confession, eighteen hours after the homicide. The evidence of these witnesses was considered only for the weight to be given to the confession. (tr. 107). The defense also offered the testimony of Dr. Louis C. Alikakos, who examined petitioner on two occasions prior to the degree of guilt hearing. Alikakos gave his opinion:

"He lost control of the situation and had the irresistible impulse to kill his wife." (tr. 133–34).

This testimony established that the degree of guilt hearing court received evidence of diminished responsibility. During Alikakos' cross-examination, however, the court made clear that it considered the *Ahearn* rule to be controlling. E.g.:

"By Judge Lagakos:

Q. But wouldn't any person who kills his wife and then attempts to kill the child, in your opinion, then be psychiatrically defective to a point where you would state that in your judgment he was unable to tell the difference between right and wrong, and, therefore, was insane—any person?

\* \* \* \* \* \*

A. I would think this would depend on a number of variables, the amount of premeditation involved in it, the kinds of stressful situations involved. I wouldn't say that the answer to your question would be no, Your Honor. I don't believe that every person who does this kind of an act in every different type of situation is insane.

\* \* \* \* \* \*

236

Q. And as a result of what he told you and solely what he told you, you concluded that at the time of the incident, about ten months previously, he was psychiatrically—what is the expression you used?

A. That he had an irresistible impulse. (tr. 150–51).

\* \* \* \* \* \*

By Judge Nix:

Q. In other words, you are saying that there is no question in your mind he knew the nature and quality of the act when he discharged these arrows toward her person?

A. I would hesitate to say that I am sure that he knew the nature and quality of his act. I think that would be an extremely difficult thing to determine after the fact not having had the opportunity to examine him at the time that this happened. He may not have known the full nature of the act that he was committing. I can't say that he did or that he did not at this point.

By Judge Lagakos:

Q. How can you say that he was psychiatrically imbalanced to a point where I think you testified that in essence did not know—.

Judge Nix: No, that he had no irresistible impulse.

By Judge Lagakos:

Q. —irresistible impulse?

A. I am saying that he had a diminished ability to recognize what he was doing and to control what he was doing, to control the impulses that he had, which is different than knowing right from wrong.

Judge Nix: I didn't ask you that. I merely said that he knew the significance of his act, did he not?

Judge Lagakos: The quality.

Judge Nix: I am not asking you to determine whether he could make a moral judgment at this particular point, just knew the effect of taking a bow and arrow and shooting five arrows into the person of a living human being.

The Witness: I misunderstood your original question. I think he did know the fact that the arrow would kill her if that is what you are asking, Your Honor.

Judge Nix: Yes.

The Witness: I believe he did know that." (tr. 154–55).

When Dr. Alikakos' report and that of Dr. Strauss were offered in evidence the Commonwealth objected:

"Mr. Czap: Your Honor, I take it that these reports are being offered by the defendants and subject to my objection as to how they were used? The Commonwealth makes no issue about the fact that Dr. Strauss is not here.

Judge Nix: Would you explain the nature and quality of your objection? Are you objecting to their being admitted at this point?

Mr. Czap: No, I object only to their relevancy and to their use—that their use be limited to that part of the case where it is proper for Your Honor to consider it." (tr. 158).

When the Court finally ruled on the renewed offer of these reports (tr. 270), this occurred:

"Judge Nix: Any objection, Mr. Czap?

Mr. Czap: No objection to the point that Dr. Alikakos being limited to the extent his testimony was permitted.

Judge Nix: Certainly. The offer is accepted." (tr. 270–71).

As I read the transcript the Commonwealth objected to consideration of Dr. Alikakos' testimony or reports on degree of guilt, but had no objection to consideration of either on sentencing, and the reports were admitted subject to that objection.

As the majority opinion points out, defense counsel did attempt to argue that diminished responsibility bore upon degree of guilt. But it is hardly a fair representation of the transcript to sug-

gest that the court considered the argument to be relevant on that issue. From the quotation of Judge Nix set forth in footnote 15 of the majority opinion, this opening sentence has been omitted.

"Judge Nix: I think you are wasting time discussing it. . . ." (tr. 327).

On the next page this appears:

"Mr. Della Porta: . . [W]e do have Dr. Alikakos; we do have Dr. Strauss who will say at that time of the act, he was under this irresistible impulse at that time his ability had been diminished to know right from wrong.

JUDGE LAGAKOS: Mr. Della Porta, are you seriously suggesting to the Court that there exists in this case facts which constitute sufficient recognized legal provocation on his part at that moment?

\* \* \* \* \* \*

MR. DELLA PORTA: All that we need is that the mind was deprived of his reasoning powers. And if we take hold of all the circumstances before this happened—.

JUDGE NIX: That is not enough." (tr. 328–29).

The record contains no statement by any one of the three judges, either while evidence was being taken, or during the closing arguments, or at the time they announced their first degree finding (tr. 347–48) that they ever considered the diminished responsibility evidence to be relevant in determining degree of guilt. The only statements in the record indicate that they considered themselves bound by the *Ahearn* rule.

The Pennsylvania courts which have considered the petitioner's case did not discover that the degree of guilt court had considered the diminished responsibility defense.[1] The district court did not discover that the degree of guilt court had considered the diminished responsibility defense.[2] The state court record discloses that it was considered only to the extent that it was rejected as irrelevant. Thus, we are squarely presented with the issue whether the petitioner's guilty plea was induced by a misstatement by counsel that evidence of diminished responsibility would be taken into consideration in determining degree of guilt. 28 U.S.C. § 2254(d) and Townsend v. Sain, *supra*, mandate an evidentiary hearing on that issue. I would reverse and remand for such a hearing.

---

1. The Pennsylvania Post Conviction Hearing Act court held that Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), precluded inquiry beyond the on-the-record colloquy at the guilty plea. The law is otherwise. Fontaine v. United States, 411 U.S. 213, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973) (per curiam); Moorhead v. United States, 456 F.2d 992 (3d Cir. 1972); United States ex rel. Davis v. Yeager, 453 F.2d 1001 (3d Cir. 1971).

2. The district court merely approved the findings of the Pennsylvania Post Conviction Hearing Act court.