UNITED STATES of America ex rel. George PAXOS

v.

Alfred T. RUNDLE.

Appeal of the COMMONWEALTH OF PENNSYLVANIA.

No. 72–1122.

United States Court of Appeals, Third Circuit.

Argued Dec. 7, 1972.

Reargued en banc Nov. 15, 1973.

Decided Jan. 16, 1974.

448

Judith Dean, Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., Richard A. Sprague, First Asst. Dist. Atty., Arlen Spector, Dist. Atty., Philadelphia, Pa., for appellant.

Robert F. Simone, Philadelphia, Pa., for appellee.

Argued Dec. 7, 1972

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

Reargued en banc Nov. 15, 1973

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

The respondent (Superintendent of a Pennsylvania prison) appeals from a district court order entered after an evidentiary hearing and granting relator a writ of habeas corpus. See United States ex rel. Paxos v. Rundle, 337 F. Supp. 315 (E.D.Pa.1971).

Relator and two co-defendants were found guilty by a jury on February 23, 1968, of conspiracy to commit burglary and robbery (# 357), aggravated robbery of Catherine McNally (# 359), aggravated robbery of Edmund McNally (# 360), and burglary with intent to commit robbery (# 361). See N.T. 2085. Post-trial motions filed on behalf of all defendants were argued and dismissed. Relator received a total prison sentence of two to ten years on all four indictments. On appeal from judgment of sentence to the Pennsylvania Superior Court, relator alleged, *inter alia*, that he was denied due process of law when the prosecuting attorney failed to disclose and/or concealed important relevant evidence favorable to the defendant. On June 11, 1970, the Superior Court unanimously affirmed judgment of sentence without an opinion. Commonwealth v. Paxos, 217 Pa.Super. 734, 268 A.2d 148 (1970). On August 21, 1970, the Supreme Court of Pennsylvania denied a petition for allocatur.

The charges arose from the robbery and the terrorization of the McNally family on the morning of May 4, 1967.[1] Relator was identified at the criminal trial as one of the three persons committing the crimes by Thomas McNally (age 13), who was the first person awakened by the noise of breaking doors,[2] and by Mr. McNally.[3] A police officer, who was a neighbor of the McNallys, testified that at about 8:35 A. M., when he placed a can of rubbish in front of his home, relator was standing near the McNally home talking to the co-defendant, Fleckenstein.[4] Mr. Brady, also a neighbor of the McNallys, testified that "about a week before" the commission of the crimes he saw Paxos sitting in a white Ford parked in front of his house between 5:00 and 6:00 P.M.

1. The background facts covered by the indictments charging the relator and his two co-defendants are conceded to be as follows in relator's brief (pp. 2–4):

 "This entire proceeding has arisen out of an incredibly vicious, wanton, and brutal criminal foray which occurred on May 4, 1967. On that date, at about 5:00 A.M., Mrs. Katherine McNally of Philadelphia, arose from bed to respond to loud knocking at the front door. At two preliminary hearings, and at the trial of this matter, Mrs. McNally explained that just as she approached the front door, *two* men, their identity concealed from her by stocking masks, burst through that door brandishing a pistol, a rifle, a black-jack, and possibly other weapons. These men pounced upon Mrs. McNally, her then 15-year old daughter, Katherine, and her 12-year old son, Tommy, violently thrust them to the floor and bound each of them with neckties, stockings, and towels found in the house. Thereafter, followed a four-hour nightmare during which the two intruders persistently demanded money from Mrs. McNally and underscored their requests with beatings, promises to maim mother and children, and ultimately, rape and sodomy perpetrated against Mrs. McNally at gunpoint.

 "A 9:00 A.M., Edmund McNally returned home from his nightwatchman's job. Seeing no unusual automobiles or persons around his home, Mr. McNally left his car and approached the back door of his house, intending to discover the reason why his wife failed to answer his customary 8:00 A.M. phone call. McNally entered and immediately *three* men attacked and viciously beat him. He struggled for nearly a half-hour until the three men subdued him, seized his wallet, and instantly fled." There is evidence to support respondent's contention that "three, possibly four men broke into" the McNally home and "participated in the events that ensued."

2. He testified that he observed Paxos twice without a mask on (N.T. 511—p. 17b of Supplemental Appendix).

3. Mr. McNally's identification of Paxos was based on (1) his ability to see "facial features," "dark brown hair," and "blue eyes" through a "white stocking" mask, and (2) Paxos' "odd way of standing" and "walking" (N.T. 360-63, 420-21, reproduced at 3b–7b of the Supplemental Appendix).

4. The police officer had known Paxos for about six or seven years and had seen him often when both he and Paxos were on the police force (N.T. 1202-08—34b-41b). Also, at least seven of the eight fellow employee alibi witnesses testified that relator was seen at work between 7:30 and 8:00 A.M., whereas the police officer saw him talking to Fleckenstein at 8:35 A.M. and his work bench was next to a door leading to the employees' parking lot (N.T. 1395, 1401 & 1421).

for 20 minutes or one-half hour (N.T. 853–57, 872—18b–23b of Supplemental Appendix). A white Ford was observed parked near the McNallys' home by the above-mentioned police officer at 6,:45 A.M., 7:55 A.M., 8:10 A.M., 8:25 A.M., and 8:35 A.M. on the morning the crimes were committed (N.T. 1165–74, 1202–08—25b–41b).[5] Another witness testified that a fingerprint corresponding to that of relator was found on a cup in the kitchen of the McNally home.

Relator did not take the stand. He produced an expert witness, who testified that the fingerprint was not that of relator, and eight fellow-employee alibi witnesses, seven of whom testified that relator was at his place of employment sometime between 7:30 A.M. and 8:00 A.M. on May 4. As to the facts upon which the habeas petition was based, the district court found as follows:

"Relator also introduced time sheets [6] which indicated that he worked on that day. The time sheets also indicated the number of hours worked by the other employees of Hershman's.[7] After the defense had rested, the district attorney reviewed the time sheets and discovered that they con-

---

5. There was evidence that, shortly before the incident, Loney (another co-defendant) had purchased a 1959 white Ford automobile for which a temporary license tag had been issued, No. E60904. This vehicle was observed by a number of persons, immediate neighbors of the McNallys, parked on the street close to the McNally home on several days immediately prior to May 4 and during the early morning hours of May 4. Other witnesses who observed the parked vehicle prior to May 4 identified Loney as one of its occupants. This evidence indicated that the perpetrators of the crime were "casing" the premises for several days prior to May 4.

6. These (Exhibit D–7) were offered in evidence by the relator. Although the appellee now contends that D–7 was offered for a limited purpose, the record does not support that contention (N.T. 1815–16). The appellee described D–8 as the "work record of Paxos," but as to Exhibit D–7 containing the work records of all employees he made no limitation in his offer of it in evidence:

"[Defense Counsel]: The payroll records, well, I don't know which one that would be—7—
"[Prosecutor]: It is the ledger book.
"[Defense Counsel]: Your Honor, with respect to D–7, I will offer D–7, or, in the alternative, D–8, which is a photostatic copy.
"The Court: Did we dispose of D–6?
"[Defense Counsel]: I withdraw it, Your Honor. It is the search warrant.
"The Court: Very well.
"[Defense Counsel]: With respect to D–7, your Honor, D–7 is a heavy book. D–8 is a photostatic copy of the page that was testified to. That is the work record of Paxos. They repeat each other, actually.
"The Court: Very well. You offer what?

"[Prosecutor]: Why don't you offer them both for the time being?
"[Defense Counsel]: All right, I will offer both of them for the time being, 7 and 8.
"The Court: That's D–7 and D–8.
"[Prosecutor]: I have no objection.
"The Court: They will be received."
In response to defense counsel's objection to the prosecution's closing argument on the ground that Exhibit D–7 had been introduced only to show that Paxos had been at work on May 4, the state trial judge said at N.T. 1900:
"The Court: What you are saying is, it seems to me, that you want to introduce records for a limited purpose, but anything in that record that might hurt you is not to come to the jury's attention.
. . . . .
"The Court: You are taking the tactical chance that what is harmful in those records will not be discovered by the prosecution."

7. The record indicates that there was considerable doubt as to the accuracy of these time sheets. The defense witness called to prove Exhibit D–7 indicated on cross-examination that the company's time sheets such as D–7 were not necessarily accurate. N.T. 1565–71. Hence, at the time of the colloquy the day after the closing argument, the trial judge in effect made a finding that "these records are not accurate," since there was testimony that the workers filled in the time they arrived themselves and that the time records were kept not so much to show when they arrived as for computing the number of hours to be charged to customers for each job. N.T. 1898. The judge also remarked that he had noticed when the time sheets were first offered that they showed alibi witness Tancini was not at work on May 4. N.T. 1899, 1901.

tained no notation of any working hours on May 4, for George Tancini, one of relator's alibi witnesses.[8] Prior to that time neither the prosecutor nor defense counsel was aware of this fact.

"The district attorney then contacted Iris Felman, a bookkeeper at Hershman's, and asked if she would testify on rebuttal that, although George Tancini had testified that he saw relator at work on the day of the robbery, the time sheets indicated that he himself was not at work. Miss Felman stated that she could not so testify until she reviewed Tancini's payroll records for the week following the robbery. Upon reviewing these records, she discovered that Tancini was paid the following week for the day of the robbery. She concluded that he had merely been late in turn-

ing in his daily time sheets to the paymaster and that he was at work on May 4. The district attorney advised her that under the circumstances he would not call her to testify. He then told relator's attorney about the time sheets, the payroll records, his conversation with Miss Felman and his decision not to call her. as a rebuttal witness.[9] Thereafter, in his closing argument to the jury, the district attorney stated that the time sheets in evidence showed that George Tancini was not at work on the day of the robbery and that the jury could infer that he committed perjury when he testified that he saw relator at work on that day.[10] The jury was never apprised of the payroll records showing that Tancini was paid for that day or the statement of Miss Felman explaining the omission in the time

8. George Tancini testified that he had an argument with relator at the shop at 7:45 on May 4 (N.T. 1475–1497).

9. The brief of counsel for appellant correctly summarizes as follows (pp. 9–10) the trial court procedure during the closing argument and on the following day:

"The aforementioned events all preceded the closing arguments of counsel to the jury. Although the arguments were not transcribed, objections made in the course of the respective summations were recorded. The objections and arguments thereon reveal that at several points in his summation, defense counsel . . . argued to the jury that the time sheets supported Paxos' alibi (R. 66a). The notes of testimony show that during the course of [the prosecutor's] rebuttal argument, [defense counsel] objected only once and then on the grounds that the rebuttal was improper since it again reviewed the evidence given by the McNally family (S.A. 59b). No other objection was made in the course of [the prosecutor's] rebuttal argument. Immediately after [that] . . . argument, the trial judged discussed with the jury their expressed desire to visit the scene of the crime, reviewed the arrangements made for them to do so, and charged them as to their conduct on the visit. Court was then recessed until the next day.

"Court reconvened on the next day . . . Counsel first made suggestions to the judge with respect to his charge to the jury regarding their obser-

vations at the scene. [Defense counsel] then stated that there were certain objections he wished to make to [the prosecutor's] rebuttal argument of the day before. The trial judge immediately stated that it ought to be made clear for the record that at no time was [defense counsel] instructed not to interrupt the district attorney during his argument, that [defense counsel] had in fact interrupted once to make an objection, and that [defense counsel's] decision not to interrupt further was his own. The judge then stated that he would nevertheless permit defense counsel to make his belated objections (S.A. 61b–62b). [Defense counsel] thereupon did make several objections to points made in [the prosecutor's] closing argument. His last objection dealt with [the prosecutor's] remarks concerning the time sheets offered by the defense to support Paxos' alibi defense."

It is noted that the trial judge's charge was not given until the second day after the closing arguments, so that there was ample opportunity for the above defense counsel to apply to reopen the record to offer the company payroll records if they were more reliable than the time sheets.

10. Since the absence of a transcript of the closing argument makes it impossible to be sure of exactly what the prosecutor said in his closing argument to the jury, the above-quoted finding of the district court as to what such prosecutor said is controlling, see F.R.Civ.P. 52(a).

sheets. Relator's counsel raised an objection to the prosecutor's comment, but the Court ruled that the argument was not improper."

337 F.Supp. at 316.

 Relator argued that he was denied due process of law when the prosecutor failed to disclose and/or concealed important relevant evidence favorable to him. Relying on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the district court held that relator had been deprived of his right to due process. We disagree. The manner in which the prosecutor disclosed the information concerning the payroll records did not violate due process. The disclosure issue in this case is governed by Moore v. Illinois, 408 U.S. 786, 794–798, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), which was decided subsequent to the district court's opinion. *Moore* distinguishes *Brady* and *Napue*, relied on by the district court. Under *Moore*, the conduct involved here clearly did not warrant a new trial. See also United States v. Clark, 454 F.2d 1056 (3d Cir. 1972).

The district court also ruled that, although the prosecutor disclosed to defense counsel the evidence concerning payment to Tancini for work on May 4 in rebuttal of D–7 and favorable to the defense prior to the closing arguments to the jury,

" . . . defense counsel was effectively foreclosed from ever introducing these matters into evidence. At the same time that the prosecutor disclosed this information to the defense, he stated that he would not call Iris Felman as a rebuttal witness to testify that George Tancini did not work on the day of the robbery. The reasonable implication of this statement was that the district attorney was satisfied with Miss Felman's explanation that Tancini was at work and that this issue would not be raised. Thus, although the payroll records were

highly material to indicate that Tancini worked on May 4, counsel reasonably declined to introduce them where he believed that the question of whether Tancini worked was not at issue and would not be put into issue."

(337 F.Supp. at 318)

In addition, the district court concluded that, had defense counsel moved to have the case reopened after closing arguments, the trial judge would have denied the motion.

After a careful review of the record, we are unable to find any evidence to support the last two sentences quoted above and the above conclusion that the defense was foreclosed from introducing the payroll records. The trial judge made no finding that the prosecutor indicated that he would not raise the issue of whether Tancini worked on May 4 and such judge found that defense counsel could have secured and offered at the trial the payroll records for the week following May 4 "by prior exercise of reasonable diligence." See page 12 of Memorandum Opinion of September 9, 1969, Commonwealth v. Fleckenstein, et al., Phila. Court of Common Pleas, Trial Division—Criminal Section, July Sess. 1967, Nos. 357, 359, 360, 361. Moreover, while the trial court felt for these reasons that the prosecutor's closing argument was proper, it can only be speculated what action the trial judge would have taken on a motion to reopen the case. Where a finding is not supported by evidence in the record, it is clearly erroneous. See Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972); 9 Wright & Miller, Federal Practice and Procedure, Civil § 2585 at 735 (1971).

██ There is also a suggestion in the district court opinion that, foreclosure aside, it was improper for the prosecutor to have argued to the jury that it could have inferred from the time records that Tancini committed perjury. See 337 F.Supp. at 316, 318. After a careful review of the trial and habeas corpus records, we have concluded that the thrust of this comment was to point

out that the time records were unreliable and that Tancini may have been lying.[11] Since the defense relied on the weekly time sheets to substantiate relator's alibi (N.T. 1902), after he had been informed by the prosecutor that those sheets offered in evidence by the defense indicated Tancini had not worked on May 4, 1967, it was proper for the prosecutor to point out the defect in this defense evidence. As stated in United States v. Casteel, 476 F.2d 152, 155 (10th Cir. 1973), "counsel does have the right to reply to an argument raised by his opposing advocate." See also United States v. Panepinto, 430 F.2d 613, 616

(3d Cir. 1970); United States v. LaSorsa, 480 F.2d 522, 526 (2d Cir. 1973). Furthermore, there was nothing in his comment to suggest that the prosecutor was intentionally misleading the jury or that he was relying on false evidence. Indeed, the trial judge specifically found that the payroll record might have been no more accurate than the time sheet and, in any case, did not prove the presence of witness Tancini at work on the day in question.[12] Therefore, the prosecutor's comment was not "so prejudicial as to constitute a denial of due process [of law]." United States ex rel. Washington v. Yeager, 448 F.2d 87, 91 (3d

11. For the district court's finding as to what the prosecutor said, see text at note 10 *supra*. During the argument on the defense counsel's objections to this comment, the prosecutor pointed out that in his closing argument he had argued in rebuttal to defense counsel's preceding closing argument that all the company's records, including the other records of the company produced by Ms. Felman, apparently were not reliable:

"... the basic thrust of what these records were offered for was to, without the time sheets which are now destroyed, was to show that the records are true, and therefore Paxos must have been at work.

"Well, the basic thrust of my argument in reply to that, in my closing remarks yesterday, was to show that the records may not have been so accurate, that maybe the fact that they show Paxos was at work on a particular day does not indicate in fact that Paxos was at work, because here you have Tancini's records that show that he wasn't at work.

. . . . .

"Now, it is true I did use the word 'perjury,' but I didn't charge Tancini with perjury. I suggested the possibility that this might exist, and I also suggested the possibility that these witnesses might have been mistaken on the alibi, and I also pointed out to the jury that there might be an explanation for the fact that Tancini's records don't show that he was at work.

"The basic purpose for saying that was to bring to the jury the fact that [counsel for Paxos] and [counsel for co-defendants] in both of their closing arguments repeatedly accused the Commonwealth of failing to bring out all the evidence, to call the detectives, to dot the I's and cross the T's. [N.T. 1894–96]

. . . .

". . . the whole argument goes to the point of the fact that these records are just not quite as reliable as the defense who introduced them into evidence and relied upon them as part of their [case would have the court believe]. [N.T. 1897]

. . . . .

"I think the record should be clear that both Mr. Reif and I noted it down at the time, and certainly Mr. Simone several times pointed [in his closing argument] to the records as support for Paxos' alibi, and I think that then the fair comment on that in reply is the record, which is the thrust of my argument, that perhaps the records aren't as accurate as they are made out to be.

"[Defense Counsel]: That is a fair comment. I agree with that." [N.T. 1902]

12. The payroll records were made up from the same daily time sheets, handed in by the workers themselves, that the trial judge found to be unreliable. See note 7, *supra*. In addition, in his Memorandum Opinion of September 9, 1969, cited at p. 9, *supra*, the trial judge stated:

"The record is a secondary record made up from others; it cannot be said to be one of original entry like the weekly time sheet. It is also equivocal in that it might tend to indicate the witness was present on a day on which he was paid wages, but there well might be other reasons for his being paid, even though absent, as an employment contract providing a limited number of days paid for time not worked each year, or substitution of sick pay for a day's absence."

Under these circumstances, the district court finding that the payroll summary "presented a substantial inference that Tancini was at work" and constituted "highly material" evidence is clearly erroneous. See 28 U.S.C. § 2254(d).

Cir. 1971). See also Conyers v. Wainwright, 309 F.Supp. 1101, 1105 (S.D. Fla.1970); *cf.* United States ex rel. Brown v. Russell, 455 F.2d 464 (3d Cir. 1972).

The dissenting opinion contends that the prosecutor's closing argument to the jury went beyond the scope of permissible advocacy. With due respect, we do not think that the record in this case supports such a conclusion. Defense counsel was informed of the existence of the payroll records prior to any of the closing arguments, according to the explicit finding of the district court in the last sentence in the quotation of the district court's opinion quoted on page 6 above, and the following sentence, starting on the last line of the quotation on that page, making clear that the closing arguments to the jury were "thereafter" this disclosure. For this reason, defense counsel was not "foreclosed", by the timing of this argument, as he could have asked to offer more testimony as soon as the prosecutor told him of the Felman evidence prior to all closing arguments.[13] Furthermore, since all the time records were submitted into evidence, and not merely those of Paxos, there is no reason why the prosecutor was not free to comment on their contents in rebuttal to the defense counsel's argument that they showed that Paxos had been at work that day. As discussed above (see note 11), the thrust of that comment was to point out that the same time records which listed Paxos as at work on May 4 also indicated that Tancini was absent; thus, the jury could conclude either that Tancini was lying when he testified that he saw Paxos at work on that day or that those records were not reliable. We see nothing improper in such a comment.

Finally, we note that the same contention that relator was denied due process of law, because the prosecutor's argument to the jury based on the defense's alibi evidence "exceeded permissible bounds" has been rejected by all seven judges of the Pennsylvania Superior Court, and all seven judges of the Pennsylvania Supreme Court after full consideration of the findings and opinion supporting such rejection by the state trial court, as set forth above. The record makes clear in our view that the state has supplied a fair and rational process for this litigation. See United States ex rel. Booker v. Johnson, 488 F. 2d 229, p. 233–234 (3d Cir. 1973). See also Schneckloth v. Bustamonte, 412 U.S. 218, 250–275, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (concurring opinion of Powell, J.).

The district court order of December 21, 1971, will be vacated and the case remanded so that the district court may pass on the other contentions in the petition for a writ of habeas corpus (see paragraphs 11 and 12 of the petition), since the district court concluded "we need not discuss the other grounds raised in the petition." 337 F.Supp. at 319.

JAMES HUNTER, III, Circuit Judge, with whom ALDISERT and GIBBONS, Circuit Judges, join (dissenting):

A prosecutor has a special obligation to see that justice is done, and it is his duty to refrain from improper methods which could produce a wrongful conviction. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); United States ex rel. Darcy v. Handy, 203 F.2d 407 (3d Cir. 1955), cert. denied Maroney v. United States ex rel. Darcy, 346 U.S. 865, 74 S.Ct. 103, 98 L.Ed. 375 (1953); United States v. Nettl, 121 F.2d 927 (3d Cir. 1941). Because I believe that the prosecutor's conduct in this case violated due process, I must dissent.

The prosecutor's closing argument to the jury went beyond the scope of permissible advocacy, and this court should not tolerate it. He did not mention the omission on the time sheets until rebuttal argument, thus foreclosing any de-

---

13. It is noted that defense counsel did not argue at the trial that he lacked an opportunity to present Ms. Felman as a witness but rather that the prosecutor should have done so. (N.T. 1891–92).

fense comment on them.[1] He then accused the defense's witness of having committed perjury because his time sheet for the day in question was incomplete when the prosecutor knew for a fact that there were other company time records that would have verified the witness's presence at work. The prosecutor did more than argue that the time records were unreliable, and he did more than argue that relator's witness could have committed perjury. He connected the alleged unreliability with the alleged perjury and argued that the witness had committed perjury *because* there was a gap in the records that the defense had introduced. He did this when he knew that other company records indicated that the witness had been present at work that day. This was intentionally misleading the jury[2] and especially harmful in this case where credibility was such a key issue.[3] With all deference to the majority I cannot agree with its conclusion that this conduct was not a violation of due process. *See* United States v. Universita, 298 F.2d 365 (2d Cir. 1962).

The majority further concludes that even if the comment by the district attorney was prejudicial, it is not reversible error. Its reasoning is that if the appellee's counsel had acted with due dil-

igence he could have introduced the payroll records himself, and thereby prevented any possibility of prejudice. Since he failed to act with the requisite due diligence at trial, the appellee cannot now complain about the consequences of his own negligence.

In order to reach this conclusion, the majority must reject, not merely as incorrect, but as clearly erroneous, at least one of two key findings of the district court. I feel that the rejection of either under this narrow standard of review is unwarranted.

The first finding that is rejected is the district court's view that appellee's failure to introduce the additional records supporting the witness's presence at work was not due to a lack of diligence. Far from finding this to be clearly erroneous, I would agree with the district court that appellee's course of conduct was entirely reasonable and indeed was almost the only logical response to what the prosecutor had told him and when he had told it to him. To require defense counsel to introduce this testimony would be to require a defendant to anticipate and refute a rebuttal argument where he has been led to believe that the rebuttal argument would not be made.[4]

1. Although the opinion of the district court only mentions that the prosecutor's remarks were made in his "closing argument," the record from the state trial court demonstrates that they were made in rebuttal to the closing argument of appellant. Notes of Testimony, 1876, 1877.

2. "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations [to refrain from improper methods], which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions . . . are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

3. The state argues that the issue involved here is peripheral to the major issues in this case. I disagree. The state's case, while overwhelming against appellee's co-defendants, was not so solid against him. The

state had alleged identification testimony of three witnesses—a 13-year old boy, his father, and a witness who allegedly saw appellee from across the street. It also allegedly had *one* fingerprint of appellee. Appellee's expert witness, the author of the FBI fingerprint manual, testified that the fingerprint was not relator's. In addition, *eight* of appellee's co-workers testified he was at work when the robbery was occurring. Credibility was thus a key issue, and I agree with the district court's conclusion that this comment affected the credibility of all of appellee's witnesses.

4. The only person whose time records were testified to was Paxos; the prosecution did not introduce any evidence or elicit any testimony as to Tancini's time records; and the prosecution did not offer any rebuttal testimony as to the records. When the prosecutor informed defense counsel of the missing time record of Tancini and of the testimony of Felman and further represented that Fel-

The second finding rejected by the majority is the district court's conclusion that the trial judge would not have allowed the defense to reopen the case. The majority characterizes this finding as speculation. However, the Pennsylvania rule on whether to allow a case to be reopened is that the matter is within the trial judge's discretion. *See* Commonwealth v. Ghaul, 205 Pa.Super. 80, 86–27, 207 A.2d 917 (1965); *Cf.* Silver v. Miller, 204 Pa.Super. 16, 18, 201 A.2d 308 (1964). Since the trial judge felt that the prosecutor's comment was proper (49a–60a, N.T. 1885–1896), it is reasonable to infer that the trial judge would not have allowed the case to be reopened. As a result, it seems to me that the district court's finding on this question is not clearly erroneous either and must be accepted by this court. F.R.C. P. 52(a). If each of these findings must be accepted, the conclusion seems inescapable that the appellee claim likewise cannot be rejected on the alternative basis that he was negligent in failing to introduce evidence to neutralize the effect of the prosecutor's comment.

As a result, I would affirm the order of the district court.

man would not be called, the district court was entirely correct in finding that defense counsel had been led to believe that the argument would not be made.